MURRAY, J.
*601 Posing as undercover police officers, defendant and a female associate committed two robberies. On one occasion, they took money from a couple at a hotel. On another occasion, they pretended to be conducting a prostitution sting operation and stole money from their target. In a hotel room where defendant was eventually arrested, police discovered rock cocaine and a glass smoking pipe.
Defendant was convicted of various crimes including robbery in the first degree ( Pen. Code, §§ 211, 212.5, subd. (a) )[1] and robbery in the second *602 degree ( §§ 211, 212.5, subd. (c) ). After striking one of two prior serious felony conviction allegations, the trial court sentenced defendant to a determinate term of 25 years in state prison and a consecutive one-year term in county jail.
On appeal, defendant contends: (1) the evidence was legally insufficient to prove the "accomplished by means of force or fear" element of robbery; (2) in the alternative, his robbery convictions should be vacated because his conduct constituted violations of more specific statutes, obtaining money by false impersonation and false pretenses (§§ 530, 532), and thus a prosecution for robbery was preempted under the rule in In re Williamson (1954) 43 Cal.2d 651, 276 P.2d 593 ( Williamson ) (the Williamson rule); (3) the admission of a nontestifying victim's statement to a police officer, as relayed to the jury by the officer, was error because the statement was inadmissible testimonial hearsay, the admission of which violated defendant's right to confrontation; (4) the prosecutor committed misconduct in his closing argument by displaying to the jury a definition of force or fear and a corresponding case citation despite the trial court having expressly rejected that definition; (5) the trial court erred in imposing a prior serious felony enhancement on count 2 and imposing and staying the same enhancement on count 3; (6) the trial court erred in imposing a prior prison *713 term enhancement pursuant to section 667.5, subdivision (b), because the trial court had granted defendant's application to redesignate the underlying conviction a misdemeanor; (7) the trial court erred in failing to stay execution of the sentences imposed on counts 7, 8, and 9 pursuant to section 654; and (8) the abstract of judgment must be corrected to reflect that the trial court stayed execution of the sentence imposed on count 3 pursuant to section 654. Additionally, while this appeal was pending, Senate Bill No. 1393 (Stats. 2018, ch. 1013) (Senate Bill 1393) amended sections 667, subdivision (a), and 1385, subdivision (b), effective January 1, 2019, to give courts the discretion to dismiss or strike a prior serious felony conviction enhancement for sentencing purposes. Defendant filed a supplemental brief urging us to remand the matter to afford the trial court the opportunity to exercise its discretion to strike the prior serious felony conviction enhancement imposed in this case, and in their supplemental brief, the People do not oppose defendant's request.
In the published portion of this opinion, we reject defendant's contention that there was insufficient evidence of the force or fear element of robbery. While we find the evidence of fear insufficient, we conclude the evidence of force sufficient to support the verdicts. We also reject defendant's contention that the assertedly more specific crimes of theft by false impersonation and false pretenses preempted the prosecution for robbery under the Williamson rule because neither of those crimes covers defendant's conduct as established by the evidence.
*603 In the unpublished portion of this opinion, we agree that the admission of the statement of the nontestifying victim given to the investigating officer violated the confrontation clause, but the error was harmless. We also conclude there were sentencing errors, requiring us to: (1) strike the section 667, subdivision (a)(1), enhancements imposed on count 2 and imposed and stayed on count 3; (2) dismiss the section 667.5, subdivision (b), prior prison term enhancement; (3) order that execution of the sentences imposed on counts 8 and 9 be stayed pursuant to section 654; and (4) remand and order that the trial court impose a full-term sentence on count 3 and stay execution thereof pursuant to section 654. Also, given the statutory change in section 667, subdivision (a), we remand for the trial court to consider whether to exercise its discretion to dismiss or strike that enhancement allegation pursuant to section 1385.
As so modified, we affirm.
FACTUAL AND PROCEDURAL BACKGROUND
The Charges
By amended information, defendant was charged with two counts of robbery in the first degree ( §§ 211, 212.5, subd. (a) ; count 1 (victim J.T.)), robbery in the second degree ( §§ 211, 212.5, subd. (c) ; count 2 (victim J.N.)), burglary in the first degree (§§ 459, 460 subd. (a); count 3 (victims J.T. & I.A.)), possession of a controlled substance ( Health & Saf. Code, § 11350, subd. (a) ; count 4), two counts of petty theft with a prior conviction (§§ 484, subd. (a), 488, 666, subd. (b); counts 5 & 6), possession of controlled substance paraphernalia (former Health & Saf. Code, § 11364.1 ; count 7), and two counts of impersonating an officer (§ 146a, subd. (a); counts 8 & 9). In connection with count 3, the information alleged that, during the commission of the first degree burglary, another person not an accomplice to the crime was present in the premises within the meaning of section 667.5, subdivision (c)(21). The information further alleged that defendant had two *714 prior strike convictions within the meaning of section 667, subdivision (e)(2), that he was previously convicted of a serious felony within the meaning of section 667, subdivision (a)(1), and that he served a prior prison term within the meaning of section 667.5, subdivision (b).
The Prosecution's Evidence
The Pacific Adult Motel Incident
In June 2012, J.T. and his wife, I.A., were staying in a hotel in West Sacramento. J.T. and I.A. arrived at the hotel at approximately 10:00 p.m.
*604 They had been at a friend's house, and J.T. had been drinking beer and did not want to drive home. After J.T. and I.A. checked in and went to their room, someone knocked on the door. J.T. opened the door and saw a thin woman with tattoos on her neck. The woman entered without invitation and offered the couple sex. J.T. said he was there with his wife and told the woman to leave. The woman lifted her blouse, displayed a badge, and said that she was an undercover police officer. I.A. testified that the woman also had a gun, but J.T. testified he did not see it.[2] The woman then spoke into a radio.
Approximately three minutes later, a man came into the hotel room and ordered J.T. to turn around and face the wall. According to I.A., the man identified himself as a police officer, though J.T. testified that the man did not identify himself as a police officer. I.A. testified that the man had a gun. She saw the gun when the man pointed it at J.T.'s back as J.T. was facing the wall. J.T. did not see a gun.
I.A. identified defendant at trial as the man who entered the hotel room. She also testified that his hair had been darker, but by the time of trial, it had "gone quite white." J.T. testified that it was possible that defendant was the man who came into the room, but stated that the man who came into the hotel room had darker hair.
Because J.T. thought defendant was a police officer, he complied with defendant's order to face the wall. The woman "put" I.A. in a corner of the room and told her not to look around. As J.T. was up against the wall, defendant grabbed J.T.'s neck, and, with his feet, spread J.T.'s feet apart. Defendant then searched J.T., saying that he wanted to see if J.T. had any drugs. Defendant asked J.T. if he was "here legally," and J.T. responded that his identification was in his wallet. Defendant removed J.T.'s wallet from J.T.'s pants pocket. J.T.'s wallet contained $ 100, which defendant took. Defendant then placed J.T.'s wallet back in his pants pocket. Defendant told J.T. to stay where he was, not to turn around, and not to leave the hotel room. Defendant and the woman then left. J.T. and I.A. went to the hotel office and asked for help.
Rebecca Bailey was the manager at the Pacific Adult Motel in West Sacramento. She testified that two hotel guests, a man and a woman, approached her at the front desk indicating that they needed her to call the police. Although they did not speak English well, Bailey understood that they were upset. Bailey called the police.
*605 Minutes earlier, Bailey had seen defendant and his girlfriend, Alicia Ortega, walking quickly from the area of J.T. and I.A.'s hotel room. Bailey knew defendant, as he had been a resident of the hotel for a couple of days.
Detective Kenneth Fellows, investigating the incident, learned of a similar occurrence from a fellow officer. Based on that information, Fellows created photographic *715 lineups and showed them to J.T. and I.A. I.A. identified Ortega in one of the photo lineups as the woman involved in the incident. Neither J.T. nor I.A. identified anyone in a photographic lineup containing defendant's photo.
The Prostitution Sting Incident
Officer Manuel Cardoza of the West Sacramento Police Department testified that, at approximately 7:40 p.m. on September 16, 2012, he was dispatched to the corner of West Capitol Avenue and Harbor Boulevard. There, he met J.N., who had called 911. J.N. told Cardoza that he had offered to buy a woman a sandwich. J.N. then agreed to pay the woman money in exchange for a sex act. They went to an alley behind a Goodwill location, at which time a male approached, identified himself as a police officer, showed a badge, and ordered J.N. to step out of his car. The man searched J.N. and took his cell phone. The woman searched J.N.'s vehicle and took $ 400. The male then pretended to speak on his radio, as if there was an emergency. J.N. asked about the property they had taken from him. The two individuals told J.N. to go around the corner and contact uniformed officers who would give him his property back. The couple then left. When J.N. went around the corner, no one was there. J.N. was upset and angry. In giving the narrative to Cardoza, J.N. "jumped around quite a bit."
An audio recording of J.N.'s 911 call was played for the jury. In the recording, which began at 7:36 p.m., J.N. stated that he wanted to report a police impersonation and theft. J.N. reported that the incident occurred five to 10 minutes before his call, but closer to five minutes. He stated that, as soon as he realized what had happened, he "raced down here to use a telephone to report it."[3] J.N. stated that he "had picked [a] female up ... then she flashed me a badge uh, told me that she was in - with the police and ... her person that was with her uh, walked up uh, acted as if he were a policeman, got me out of my car uh, frisked me,[4] took my cell phone, took a large amount of *606 money I had ... in a pocket. About $ 400. Uh, maybe closer to 5. They directed me to ... some squad units which were apparently around the corner and they weren't around the corner." J.N. stated that he had been with the female in the car when the male approached. When J.N. and the woman exchanged cash, the female told J.N. he was under arrest. J.N. said the individuals were purporting to arrest him for soliciting a prostitute, "[o]nly it was apparently a scam." J.N. described the perpetrators to the 911 operator.
J.N. was unavailable and did not testify at trial.[5]
The Arrest of Defendant and Ortega and Subsequent Searches
Fellows obtained arrest warrants and arrested defendant and Ortega. At the time of his arrest, defendant had two bags of marijuana on his person. In the hotel room where Fellows arrested Ortega, he found cell phones, rock cocaine, marijuana, *716 drug paraphernalia including a syringe and pipes, and a knife.
Fellows later searched a storage unit used by defendant and Ortega. Ortega told Fellows that items she and defendant used in impersonating officers were in that storage unit. In the storage unit, Fellows discovered a toy gun which looked like a black semiautomatic handgun and several radios that looked like police radios.
Alicia Ortega's Testimony
Alicia Ortega testified for the prosecution. She had entered a guilty plea to committing a robbery of J.N. in exchange for a 10-year prison sentence.
Ortega testified that she had previously been in a relationship with defendant, and that she was in a relationship with him when they robbed J.N. Ortega testified that it had been her intention to "rob a trick ...." She testified that she and defendant both had badges, which they had purchased at an army surplus store, and that she impersonated an officer.
Ortega encountered J.N. in the area of West Capitol Avenue and Harbor Boulevard. She directed J.N. to a particular location. J.N. and Ortega negotiated for Ortega to perform a sex act, and J.N. gave her $ 40. However, Ortega then got out of the car and displayed her badge, and defendant appeared and said, "West Sac P.D." Ortega told J.N. to exit the vehicle, and she "put" J.N. against the hood of the car. While Ortega patted J.N. down, *607 defendant searched the vehicle. Ortega searched J.N.'s wallet. Ortega then pretended to receive another call, and she "basically ... took off."
When Ortega returned to the room where she was staying with defendant, she had the $ 40 J.N. had given her for the sex act and defendant had $ 400 he had taken from J.N.
Ortega acknowledged that she had prior convictions for assault with a deadly weapon and robbery. She was addicted to heroin, methamphetamine, and "a few other drugs." She testified that, on the day police arrested her, the crack cocaine discovered in her room belonged to defendant.
On cross-examination, Ortega was asked if she had been involved in an incident at the Pacific Motel involving a Hispanic couple, and Ortega responded, "[p]robably."[6] Ortega testified that a Hispanic man approached her on West Capitol Avenue and asked her to come back to his room. The man offered methamphetamine in exchange for Ortega returning to the hotel room with him and having sex with him and his wife. Ortega went to the motel room with the man, and, a couple of minutes later, defendant knocked on the door. Ortega let defendant in, and they both displayed badges and pretended to be police officers. Ortega testified that she did not have a gun and that defendant did not use a gun that night.
The Defense Evidence
Detective Alicia Slater, who worked in YONET, a Yolo County narcotics task force, testified that defendant was a confidential informant. Slater worked with defendant "more than anybody else ..." over a two-year period. Slater testified that defendant was reliable and provided her with valuable information which led to a number of arrests. Slater stated that defendant was one of the best informants to ever work for her. There were occasions when both Slater and her partner put their lives in his hands. Slater also occasionally worked with Ortega as a confidential informant, *717 but Ortega was not reliable. On the Sunday before defendant was arrested, he called Slater and told her that he had set up a drug deal, but that the dealer had come over and dropped off the drugs in his room. Slater instructed defendant to get rid of the drugs.
Defendant testified. He acknowledged that he had sustained a 2000 conviction for burglary in the second degree resulting in a state prison sentence.
At some point during his relationship with Ortega, defendant learned that she was a prostitute. He also discovered that she was using heroin when he *608 came home one day and found her passed out on the floor with a needle in her arm. Defendant took Ortega to a methadone clinic to try to help her.
Defendant testified that, one night in June 2012, at approximately 1:00 a.m., he left his motel room with Ortega to go out and buy aspirin. As defendant hurried towards the store, which was about to close, he left Ortega behind. Defendant saw J.T. in front of the motel and noticed that he approached Ortega. Defendant entered the store and purchased aspirin and cigarettes. When he left the store, defendant noticed that J.T. and Ortega were no longer standing outside. As defendant walked back toward the motel, he saw J.T. and Ortega standing near one of the rooms. Ortega walked towards defendant while J.T. remained where he was, "looking at [Ortega], like, what's going on?" Ortega told defendant that "he thinks I am a bag whore," meaning someone who would have sex in exchange for drugs. Defendant said, "I know he didn't disrespect you like that," and Ortega told him to "[j]ust leave well enough alone." Defendant and Ortega returned to their room. Defendant was upset, and he went to J.T.'s room. Defendant knocked on the door, and someone inside told him, in Spanish, to come in. Defendant opened the door and stood at the threshold, not entering the room. He saw I.A. sitting on the bed, placing small plastic baggies containing what appeared to be methamphetamine into a plastic bag. Defendant then saw I.A. place a glass pipe in her bra. I.A. walked out of the room and placed her purse in her car. J.T. came towards defendant and asked what he wanted. Defendant responded: "if you ever ask my woman again to have sex with you for drugs, I know people and law enforcement will be glad to know you are over here selling dope." Defendant then went back to his room. Defendant testified that he did not have a badge, a gun, or a radio, and he never actually entered J.T. and I.A.'s room. He testified that he never impersonated a law enforcement officer, and he did not take anything from J.T.
Regarding the incident involving J.N., defendant testified that he was getting something to eat at a restaurant on Harbor Boulevard when Ortega told him that a man had approached her and wanted to give her "a couple hundred dollars." Defendant told her no, that she was not going to do that, but Ortega would not listen to him and she jumped into someone's vehicle. As defendant ate, he grew concerned about Ortega. Defendant walked towards a location that Ortega knew defendant frequented, hoping that she would come and find him. Defendant saw Ortega getting out of a vehicle. Defendant walked towards Ortega, and he then saw J.N. getting out of the vehicle, zipping up his pants and walking towards Ortega. Defendant asked Ortega what was going on, but she walked away on West Capitol Avenue. J.N. advanced towards defendant and Ortega, and screamed, "Stop that whore bitch. That whore bitch, I just gave that bitch a substantial amount of money ...." Defendant tried to calm J.N. down, but J.N. said, "I know you know that bitch. You and her *718 ripped me off for my sexual desires." He then *609 threatened to call the police. Defendant told J.N.: "I didn't rip you off. I don't know what you are talking about, but if you've got a problem with what you and her does, if you want to talk to the policeman, there's plenty of policeman up and down West Capitol, there's plenty of policeman right there right in this parking lot." J.N. jumped into his vehicle and drove off. Defendant testified that he never told J.N. that he was a police officer, and he did not have a gun, badge, or handcuffs. Defendant never searched or touched J.N., and he did not search his vehicle or steal money from him.
Defendant testified that at the time he and Ortega were arrested, Ortega "had a bunch of paraphernalia ..." in their hotel room. Defendant testified that the pipe discovered by police belonged to Ortega. Defendant also testified that he had never used rock cocaine. Defendant testified that, in connection with his work as an informant for YONET, a man had come to his room to show him rock cocaine that he was selling. The man put the cocaine down and left. Initially, defendant did not realize that the man had left the cocaine in his room. When he realized that the man left the cocaine, defendant attempted to call the man back, but he could not get in touch with him. Defendant then called Slater. As defendant was talking to Slater, the man called back and said he would come to get the cocaine. Anticipating the man's return, defendant did not get rid of the cocaine, and he was arrested later that morning.
Defendant testified that the storage unit police searched was used by Ortega and other transient people. Defendant testified that he did not own transmitter radios. When shown photographs of radios and a replica gun found in the storage unit, defendant testified that he had never seen those items before.
Verdict and Sentence
The jury found defendant guilty of robbery in the first degree ( §§ 211, 212.5, subd. (a), count 1 (victim J.T.)), burglary in the first degree (§§ 459, 460, subd. (a), count 3 (victims J.T. & I.A.)), robbery in the second degree ( §§ 211, 212.5, subd. (c), count 2 (victim J.N.)), possession of a controlled substance ( Health & Saf. Code, § 11350, subd. (a), count 4), possession of controlled substance paraphernalia (former Health & Saf. Code, § 11364.1, count 7), and two counts of impersonating an officer (§ 146a, subd. (a), counts 8 & 9). The jury also found true the allegation that, during the commission of the burglary charged in count three, another person not an accomplice to the crime was present in the premises within the meaning of section 667.5, subdivision (c)(21).
Defendant waived jury trial on the enhancement allegations. The trial court found, beyond a reasonable doubt, that defendant had been convicted of two *610 strikes within the meaning of section 667, subdivision (e)(2), that he was previously convicted of a serious felony within the meaning of section 667, subdivision (a)(1), and that he had previously served a prison term within the meaning of section 667.5, subdivision (b).
The trial court sentenced defendant to an aggregate term of 25 years in state prison and one consecutive year in county jail, calculated as follows: On count 1, robbery in the first degree, the upper term of six years, doubled to 12 years based on a prior strike conviction,[7] plus a five-year *719 enhancement pursuant to section 667 subdivision (a)(1); on count 2, robbery in the second degree, one year (one-third of the middle term), doubled to two years based on a prior strike conviction, plus a five-year enhancement pursuant to section 667, subdivision (a)(1)[8] ; on count 3, burglary in the first degree, the middle term of 16 months, doubled to 32 months based on a prior strike, plus a five-year enhancement pursuant to section 667, subdivision (a)(1), with the sentence on count 3 stayed pursuant to section 654; on count 4, possession of a controlled substance, a concurrent term of one year in county jail as a misdemeanor;[9] on count 7, possession of controlled substance paraphernalia, a concurrent term of six months in county jail; on counts 8 and 9, impersonating a police officer, consecutive terms of six months in county jail on each count; and one year for the prior prison term enhancement pursuant to section 667.5, subdivision (b).
DISCUSSION
I. Legal Sufficiency of the Evidence of Force or Fear for Robbery Convictions
A. Defendant's Contentions
Defendant contends that the evidence was legally insufficient to prove the element of force or fear to sustain his robbery convictions. According to defendant, the victims complied with his demands because they believed he was a police officer. Defendant contends that this does not give rise to any *611 reasonable inference that he accomplished the taking of property by means of force or fear, and that, if anything, these incidents were thefts by false pretenses.
Surprisingly, there is a dearth of published cases discussing robbery involving defendants impersonating police officers. We conclude that while the evidence here was insufficient to establish a taking by means of fear, the evidence was legally sufficient to establish the that the takings were accomplished by means of force.
B. Standard of Review and Applicable General Principles of Law
"When reviewing a challenge to the sufficiency of the evidence, we ask ' "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' [Citations.] Because the sufficiency of the evidence is ultimately a legal question, we must examine the record independently for ' "substantial evidence-that is, evidence which is reasonable, credible, and of solid value" ' that would support a finding beyond a reasonable doubt." ( People v. Banks (2015) 61 Cal.4th 788, 804, 189 Cal.Rptr.3d 208, 351 P.3d 330 ( Banks ).)
"Robbery is 'the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear.' " ( *720 People v. Williams (2013) 57 Cal.4th 776, 781, 161 Cal.Rptr.3d 81, 305 P.3d 1241 ( Williams ), quoting § 211, italics omitted.) "In general, theft is the felonious taking, carrying, stealing, leading, or driving away of the personal property of another, or the appropriation of property, labor or money by fraudulent means. (§ 484.) 'The greater offense of robbery includes all of the elements of theft, with the additional element of a taking by force or fear.' " ( People v. Whalen (2013) 56 Cal.4th 1, 69, 152 Cal.Rptr.3d 673, 294 P.3d 915, disapproved on other grounds in People v. Romero (2015) 62 Cal.4th 1, 44, fn. 17, 191 Cal.Rptr.3d 855, 354 P.3d 983.) "This element is cast in the alternative; it may be accomplished either by force or by fear." ( People v. Mullins (2018) 19 Cal.App.5th 594, 604, 228 Cal.Rptr.3d 198 ( Mullins ), italics added.)
Defendant does not dispute that he took the personal property in the possession of the victims from their persons or their immediate presence. The only element at issue here is defendant's use of force or fear as a means by which to accomplish the takings.
*612 C. Fear
1. The Fear Element
"The fear mentioned in Section 211 may be either: [¶] 1. The fear of an unlawful injury to the person or property of the person robbed, or of any relative of his or member of his family; or, [¶] 2. The fear of an immediate and unlawful injury to the person or property of anyone in the company of the person robbed at the time of the robbery." (§ 212.)
"To establish a robbery was committed by means of fear, the prosecution 'must present evidence "that the victim was in fact afraid , and that such fear allowed the crime to be accomplished." ' " ( People v. Morehead (2011) 191 Cal.App.4th 765, 772, 119 Cal.Rptr.3d 680 ( Morehead ), italics added.) Thus, the fear element is subjective in nature. ( People v. Bordelon (2008) 162 Cal.App.4th 1311, 1319, 77 Cal.Rptr.3d 14 ( Bordelon ).) However, the victim need not explicitly testify that he or she was afraid of injury where there is evidence from which it can be inferred that the victim was in fact afraid of injury. ( Ibid. , citing People v. Mungia (1991) 234 Cal.App.3d 1703, 1709, fn. 2, 286 Cal.Rptr. 394 ( Mungia ).) "The fear is sufficient if it facilitated the defendant's taking of the property. Thus, any intimidation, even without threats, may be sufficient." ( Mullins , supra , 19 Cal.App.5th at p. 604, 228 Cal.Rptr.3d 198, citing Morehead , at pp. 774-775, 119 Cal.Rptr.3d 680.) However, given the language of section 212, the intimidation must not only produce fear, but the fear must be of the infliction of injury.
2. The Pacific Adult Hotel Incident
J.T. did not testify that defendant's actions placed him in fear, or that he surrendered property because he was afraid he or I.A. or their property would be injured. I.A. did testify that, during the encounter, she "was very scared" and that she "was frightened." However, defendant did not take anything from I.A., but instead only took property from J.T., and defendant did not accomplish a taking of money from J.T.'s wallet by instilling fear in I.A.
J.T. twice testified that he complied with defendant because J.T. "thought he was a police officer." He did not say he was afraid of being injured by defendant if he did not comply. Indeed, he was never even asked what he thought would happen if he did not comply. Nor did he testify that he suspected defendant might not be a police officer during the encounter. Although I.A. testified that the man who entered their hotel room displayed a gun, J.T. did not *721 see a gun, apparently because his back was turned when defendant pointed the gun at him. Bailey testified that, when I.A. and J.T. approached her in the hotel office after the incident, they "seemed upset." But there was no follow-up with Bailey as to this observation or any other description of their demeanor. *613 As we have noted, the victim need not explicitly testify that he or she was afraid of injury where there is evidence from which it can be inferred that the victim was in fact afraid of injury. ( Bordelon, supra , 162 Cal.App.4th at p. 1319, 77 Cal.Rptr.3d 14 ; Mungia , supra , 234 Cal.App.3d at p. 1709, fn. 2, 286 Cal.Rptr. 394.) At trial and again on appeal, the People rely largely on the theory that defendant's representation of himself as a police officer was sufficient to establish the element of fear. In closing arguments, the prosecutor argued that, because defendant and Ortega posed as police officers, "the threat of force is implied. The threat of arrest carries with it the threat that one's compliance, if not otherwise forthcoming, will be physically forced, thus the use of force is implied when ... arrest is threatened." The prosecutor further asserted that, "when the defendants pose as police officers, the victims know 'If I don't comply, they are going to beat me. You know, they are going to physically manhandle me. They are gonna maybe tase me, maybe even shoot me'. That's what gives officers their authority." On appeal, the People argue that the fact defendant identified himself as a police officer, thereby implying he had a gun, and his command not to move provided "sufficient intimidation to constitute the use of fear in the taking."
Defendant counters that the fact that the victims believed defendant to be a police officer was legally insufficient in itself to establish, beyond a reasonable doubt, that the victims were placed in fear of injury and defendant accomplished these takings by means of that fear. Defendant asserts that members of society, as a general matter , do not comply with police orders because the police place individuals in a state of fear, but because it is their civic duty to do so.
The People have not brought to our attention a case in which a defendant's representation that he or she was a police officer, without more , was sufficient to instill fear sufficient to support a robbery conviction. We have not found such a case through our own research, and we conclude more is indeed required. While an encounter with a supposed police officer might be frightening, this alone does not establish that any fear the victim suffered was fear of an injury. To prove the element of fear here, the prosecution was required to establish that the victim was placed in actual fear of injury.
In asserting that the evidence was legally sufficient to establish the element of fear, the People rely on a robbery case with some similarities to this one, in which the defendant posed as a police officer. In People v. Gonzales (2003) 114 Cal.App.4th 560, 8 Cal.Rptr.3d 88 ( Gonzales ), the "defendant and another man approached [K.]. and [S.], who were towing a vehicle late at night. [The] defendant and his cohort claimed to be 'undercover cop[s]' and told [K.] that what he was doing was illegal. [K.]. was 'scared' at the time. [The] defendant pat searched [K.] and asked for his ID and wallet. [K.] began to suspect that *614 [the] defendant was not a police officer and considered asking [the] defendant for a badge, but opted not to because he was 'scared' that [the] defendant could physically harm him ; he also feared [the] defendant could have a gun. " ( Id. at p. 570, 8 Cal.Rptr.3d 88, italics added.) The Court of Appeal concluded that "the evidence was sufficient to support a finding that [the] *722 defendant took [K.'s] property by means of fear of unlawful injury. [K] specifically testified that [the] defendant's actions and words placed him in fear of physical harm." ( Ibid. )
While there are certain similarities between Gonzales and this case, there are also critical distinctions. J.T., the actual robbery victim here, did not testify he complied because he thought either defendant or Ortega were armed. Nor did he testify that he thought he would be injured or even that he was scared. Additionally, there was no evidence J.T. began to question whether defendant was, in fact, a police officer during the encounter and complied because he thought he would be injured if defendant was not a police officer. The type of evidence establishing the element of fear in Gonzales is absent here. There was simply no evidence from which it can be inferred that J.T. was in fear of injury or that the taking was accomplished by placing him in such fear.
The People also rely on Morehead, supra , 191 Cal.App.4th 765, 119 Cal.Rptr.3d 680, which involved prosecution for several unarmed bank robberies and an attempted robbery by use of a note demanding money. One bank teller testified that she "panicked" and was "afraid." ( Id. at p. 775, 119 Cal.Rptr.3d 680.) In that incident, the defendant had produced a note that read, "Robbery 100s/50s." ( Ibid. ) During the crime, the defendant told the teller, "[h]urry, [h]urry." ( Ibid. ) In a second incident, another teller testified that she was "scared and nervous," and demonstrated fear of defendant at trial when she asked, " 'Do I have to look at him?' " after she was asked to make an in-court identification. ( Id. at p. 776, 119 Cal.Rptr.3d 680.) In that incident, the defendant produced a note that read, "This is a robbery," and when the teller tried to take the note, the defendant " 'snatched' " it back. Another teller observed the victim teller " 'frantically' " take the cash out of her drawer and hand it over to the defendant. ( Ibid. ) In a third incident, the defendant showed the teller a note demanding money. The teller testified that she "got really nervous," was "afraid," and was "scared" that if she failed to comply with the defendant's demands, "something else could occur." ( Ibid. ) In a fourth incident, the teller testified that she was scared. ( Id. at p. 777, 119 Cal.Rptr.3d 680.) In that incident, the defendant held a note against the glass that read, " 'Robbery, no dye packs, second drawer.' " ( Ibid. )
The defendant in Morehead contended that the evidence was legally insufficient to support the element of force or fear for purposes of the robbery *615 and attempted robbery convictions, particularly because all he did was hand the tellers a piece of paper demanding money and he never threatened anyone or displayed a weapon. ( Morehead, supra , 191 Cal.App.4th at p. 777, 119 Cal.Rptr.3d 680.) The Court of Appeal rejected the defendant's contentions, reasoning that the defendant "dressed in a partial disguise, entered the financial institutions and demanded money from the tellers. The testimony of each victim regarding her reaction to [the defendant's] demand for money reflected a perception that she had no choice but to comply with his demand. Any reasonable jury would conclude the tellers had no way of knowing what [the defendant] might do if they failed to comply, and their prompt compliance showed they viewed [the defendant's] demands as carrying an implicit threat he might harm them if they did not immediately hand money over to him. The evidence strongly supports a conclusion that [the defendant's] demands engendered both actual and reasonable fear in *723 the employees."[10] ( Id. at p. 778, 119 Cal.Rptr.3d 680.) The Court of Appeal concluded that substantial evidence supported the defendant's convictions of robbery and attempted robbery. ( Ibid. )
Ignoring the other circumstances in Morehead , the People here focus solely on the victims' compliance with the robbers' demands, arguing that their "prompt compliance showed they viewed [the defendant's] demands as carrying an implicit threat he might harm them if they did not immediately ... let [defendant] take their property." From this, the People argue that the evidence here "strongly supports a conclusion that defendant's demands engendered both actual and reasonable fear in the victims." However, unlike in Morehead , there is no direct or circumstantial evidence here establishing that J.T. was in fear of injury and that the taking was accomplished by means of that fear. We of course realize that direct evidence of fear is not necessarily required and fear of unlawful injury may be inferred from the circumstances. ( People v. Holt (1997) 15 Cal.4th 619, 690, 63 Cal.Rptr.2d 782, 937 P.2d 213.) Morehead is illustrative of this point. The fear in Morehead was based on the implicit threat posed by a bank robber, who had announced by his notes his intent to take money. Morehead does not support the People's position that the victims in this case were in fear of defendant injuring them because he identified himself as a police officer, or that the taking was accomplished by that fear.
One other case, People v. Majors (2004) 33 Cal.4th 321, 14 Cal.Rptr.3d 870, 92 P.3d 360 ( Majors ), a kidnapping and kidnapping for rape prosecution, warrants discussion. The prosecutor in the instant case relied upon *616 Majors for a special instruction the trial court rejected and his argument to the jury was based on language from Majors. In Majors , our high court held that the implicit threat of arrest satisfies the force or fear element for kidnapping "if the defendant's conduct or statements cause the victim to believe that unless the victim accompanies the defendant the victim will be forced to do so, and the victim's belief is objectively reasonable." ( Id. at p. 331, 14 Cal.Rptr.3d 870, 92 P.3d 360.) Section 207, subdivision (a), provides: "Every person who forcibly, or by any other means of instilling fear , steals or takes, or holds, detains, or arrests any person in this state, and carries the person into another ... county, or into another part of the same county, is guilty of kidnapping." (Italics added.) The Majors court reasoned that "the threat of arrest carries with it the threat that one's compliance, if not otherwise forthcoming, will be physically forced. Thus, the use of force is implicit when arrest is threatened." ( Majors , at p. 331, 14 Cal.Rptr.3d 870, 92 P.3d 360.)
In Majors , a kidnapping for rape case, the victim, a teenage female, encountered defendant when he flashed a badge and ordered her to stop. ( Majors, supra , 33 Cal.4th at p. 324, 14 Cal.Rptr.3d 870, 92 P.3d 360.) The defendant told her he had received a call about a theft from a store in a nearby mall and told the victim she would have to return with him to the store. ( Ibid. ) The victim testified that she complied and went with the defendant in his *724 van because she was scared that if the defendant was who he claimed, she would be arrested. ( Ibid. ) However, he did not do anything to cause her to be afraid for her safety before she got into the van. ( Ibid. )
The Majors kidnapping scenario is different from the scenario presented in the instant case. Kidnapping does not expressly require the fear of injury, but merely the fear that one's movement will be forced. Thus, fear of injury is not required for kidnapping. Indeed, in Majors , the victim expressly testified she did not fear for her safety. She only feared she would be arrested. ( Majors , supra , 33 Cal.4th at pp. 324-325, 14 Cal.Rptr.3d 870, 92 P.3d 360.) And the Majors court did not hold that there was substantial evidence of fear of injury, only that there was substantial evidence of fear the movement would be forced if the victim did not comply. ( Id. at p. 331, 14 Cal.Rptr.3d 870, 92 P.3d 360 ["there was substantial evidence here of force or fear, i.e., that [the victim] entered defendant's van under such implicit threat of arrest"].) Moreover, based on the plain wording of the statute, the purpose of using force or instilling fear is to steal, take, hold, detain, or arrest a person to move that person. Thus, the fear of arrest satisfies the fear element for kidnapping without the fear of injury. Majors does not support the People's fear theory in this robbery case where the fear element requires fear of injury.
We conclude there is not substantial evidence establishing the fear of injury element regarding the robbery of J.T.
*617 3. The Prostitution Sting Incident
The evidence of fear of injury is even less substantial concerning the robbery of J.N. Here, again, the People rely solely on defendant having identified himself as a police officer and his act of displaying a badge. But under the circumstances, this was insufficient to establish that J.N. was in fear of injury. Moreover, J.N. never told anybody he was in fear during the incident. No weapons were displayed. There was no evidence in J.N.'s 911 call or his statement to the officer that he suspected defendant was not a police officer during the encounter. Thus, there is no evidence, direct or circumstantial, from which it can be inferred that J.N. was in fear of injury.
We conclude there is not substantial evidence establishing the fear of injury element regarding the robbery of J.N.
D. Force
1. The Prosecution's Trial Theory and the Instructions
Defendant insists that the "prosecutor did not proceed on the basis that [defendant] used force to accomplish the robberies." We disagree. While the prosecutor principally relied on the theory that defendant's impersonation of a police officer implied a threat of force, he also emphasized in closing that J.T. was forced against a wall. He also reminded the jury that J.N. was "forced against the hood of the car. He was searched." In his rebuttal argument, the prosecutor stated: "Next the defense attacks the robbery ... saying that there was no fear, there was no force that was used. [¶] Well, if you go back and listen to the testimony, [J.T.], he was forced up against the wall. [J.N.] was forced up against his hood, so when this physical intimidation is force was used [sic ]? [¶] I mean, the issue of police personation aside, there was actual physical force used. " (Italics added.) Thus, contrary to defendant's contention, the prosecutor also relied on a theory of force as supporting the robbery convictions.
Moreover, the jury was instructed on force as well as fear. The trial court instructed the jury with *725 CALCRIM No. 1600 on robbery.[11] That instruction *618 informed the jury that, to support a robbery conviction, the People were required to prove, beyond a reasonable doubt, that "the defendant used force or fear to take the property or to prevent the person from resisting ...." ( CALCRIM No. 1600, as given, italics added.) Thus, because the jury was free to reach guilty verdicts on a force theory, we look to whether there was substantial evidence of force to support those verdicts.
2. The Force Element
"[T]he 'force' required for robbery is not necessarily synonymous with a physical corporeal assault." ( People v. Wright (1996) 52 Cal.App.4th 203, 210, 59 Cal.Rptr.2d 316.) However, "[t]he law does require that the perpetrator exert some quantum of force in excess of that 'necessary to accomplish the mere seizing of the property.' " ( People v. Anderson (2011) 51 Cal.4th 989, 995, 125 Cal.Rptr.3d 408, 252 P.3d 968 ( Anderson ).) "[T]he force need not be great." ( People v. Joseph (2019) 33 Cal.App.5th 943, 951, 244 Cal.Rptr.3d 380.) "An accepted articulation of the rule is that '[a]ll the force that is required to make the offense a robbery is such force as is actually sufficient to overcome the victim's resistance ....' " ( People v. Burns (2009) 172 Cal.App.4th 1251, 1259, 92 Cal.Rptr.3d 51 ( Burns ); accord, Mullins , supra , 19 Cal.App.5th at p. 604, 228 Cal.Rptr.3d 198 ["the degree of force need only be sufficient to overcome the victim's resistance"].)
For example, in People v. Garcia (1996) 45 Cal.App.4th 1242, 1246, 53 Cal.Rptr.2d 256 ( Garcia ), disapproved on other grounds in People v. Mosby (2004) 33 Cal.4th 353, 365, footnotes 2 and 3, 15 Cal.Rptr.3d 262, 92 P.3d 841, the defendant approached a cashier in a market as she stood in front of an open cash register. Defendant "lightly pushed" his shoulder against the cashier's shoulder, " 'like a tap.' " Feeling this, the cashier moved away from the register. The defendant took money from the register and left. ( Garcia , at pp. 1244-1245, 53 Cal.Rptr.2d 256.) Rejecting the defendant's claim that he was entitled to an instruction on a lesser included offense of theft because the touching was incidental and insufficient to establish force, the Garcia court reasoned that the defendant's conduct went beyond the quantum of force necessary to grab the money. ( Id. at pp. 1245-1246, 53 Cal.Rptr.2d 256.)
In Mullins , supra , 19 Cal.App.5th 594, 228 Cal.Rptr.3d 198, the defendants were charged with robberies at ATMs. In one of the robberies, just before the victim was going to push the ATM button indicating he did not want another transaction, the defendant pushed the victim aside. ( Id. at p. 599, 228 Cal.Rptr.3d 198.) He then took the victim's *619 place in front of the ATM and *726 withdrew money from the victim's account. ( Ibid. ) Noting that the victim had variously described the defendant's conduct as nudging or shoving him away from the ATM, a panel of this court concluded that this force was sufficient to overcome the victim's resistance and thus was sufficient to establish robbery even without a showing of fear. ( Id. at p. 604, 228 Cal.Rptr.3d 198.) In a second incident, the victim turned back to the ATM after realizing he had not pushed the button indicating he had finished his transaction, but, by then, the defendant had situated himself in front of the ATM. When the victim reached over to see if he had logged off, the defendant "pushed his body in front of" the victim, "pushed [the victim's] hands away" and informed the victim he was using the ATM. Thereafter, he withdrew money from the victim's account. ( Id. at p. 600, 228 Cal.Rptr.3d 198.) This court concluded that this conduct also supported a finding of force-"force in pushing [the victim's] hands away so he could not finish his business at the ATM." ( Id. at p. 605, 228 Cal.Rptr.3d 198.)
With these principles and examples in mind, we now turn to the evidence of force in this case.
3. The Pacific Adult Motel Incident
Here, the physical force used on J.T. was more substantial than that employed by the defendants in either Garcia , supra , 45 Cal.App.4th 1242, 53 Cal.Rptr.2d 256, or Mullins , supra , 19 Cal.App.5th 594, 228 Cal.Rptr.3d 198. J.T. testified that, after the man posing as a police officer entered his hotel room, the man "grabbed [J.T.] by the neck , and with his feet he opened [J.T.'s] feet" and searched J.T. I.A. testified that defendant "grabbed [J.T.] and put him against the wall with his hands against the wall." (Italics added.) I.A. also testified that defendant "was acting like a policeman because he separated his feet and then he put his arms up above." Defendant then took money from J.T.'s wallet.
Viewing the evidence in the light most favorable to the prosecution ( Banks, supra , 61 Cal.4th at p. 804, 189 Cal.Rptr.3d 208, 351 P.3d 330 ), we conclude that this evidence was legally sufficient to prove that defendant employed force in his encounter with J.T. and that he accomplished a taking from J.T. by means of using that force. The force defendant used exceeded the amount of force " 'necessary to accomplish the mere seizing of the property,' " ( Anderson, supra , 51 Cal.4th at p. 995, 125 Cal.Rptr.3d 408, 252 P.3d 968 ; Mullins , supra , 19 Cal.App.5th at p. 604, 228 Cal.Rptr.3d 198 ), specifically the removal of J.T.'s wallet and the taking of cash therefrom. A rational trier of fact could have found, beyond a reasonable doubt, that the force defendant employed was sufficient to overcome J.T.'s resistance. ( Mullins , at p. 604, 228 Cal.Rptr.3d 198 ; Burns, supra , 172 Cal.App.4th at p. 1259, 92 Cal.Rptr.3d 51.)
Thus, there was substantial evidence of force to support the conviction of robbery in the first degree charged in count 1.
*620 4. The Prostitution Sting Incident
In his 911 call, J.N. stated that, after Ortega flashed her badge, an individual approached him acting as if he was a police officer, "got [J.N.] out of [his] car ..., frisked [him], took [his] cell phone, took a large amount of money [J.N.] had ... in a pocket." (Italics added.) Ortega's testimony was slightly different in that she testified she ordered J.N. out of the car and frisked him. She also testified that she "put" J.N. on the hood of his car. While she frisked J.N., defendant searched the vehicle. She testified that it was defendant who obtained the victim's $ 400. The trial *727 court instructed the jury with CALCRIM No. 400 on the general principles of aiding and abetting, and with CALCRIM No. 401 on aiding and abetting intended crimes.
Viewing this evidence in the light most favorable to the prosecution ( Banks, supra , 61 Cal.4th at p. 804, 189 Cal.Rptr.3d 208, 351 P.3d 330 ), we conclude that the evidence was legally sufficient to prove, beyond a reasonable doubt, that defendant and Ortega employed force in the encounter with J.N., and that the taking from J.N. was accomplished by means of using that force. The act of "put[ting]" J.N. on the hood of his car and the separate act of frisking him each exceeded the amount of force " 'necessary to accomplish the mere seizing.' " ( Anderson, supra , 51 Cal.4th at p. 995, 125 Cal.Rptr.3d 408, 252 P.3d 968 ; Mullins , supra , 19 Cal.App.5th at p. 604, 228 Cal.Rptr.3d 198 ) A rational trier of fact could have found, beyond a reasonable doubt, that the force employed was sufficient to overcome J.N.'s resistance. ( Mullins , at p. 604, 228 Cal.Rptr.3d 198 ; Burns, supra , 172 Cal.App.4th at p. 1259, 92 Cal.Rptr.3d 51.)
Therefore, there was substantial evidence of force to support defendant's conviction of robbery in the second degree in count 2.
II. Application of the Williamson Rule
A. Defendant's Contention
Defendant contends that the Legislature has enacted more specific statutes for punishing the conduct in which he engaged. He argues that, where a general statute proscribes the same conduct as a special statute, the special statute controls. According to defendant, under the rule established in In re Williamson, supra , 43 Cal.2d 651, 276 P.2d 593, section 530, false personation, and section 532, false pretenses, are more specific statutes than section 211, robbery, and thus defendant could not be convicted of robbery.
We conclude that the Williamson rule does not apply here.
*621 B. Analysis
"Under the Williamson rule, if a general statute includes the same conduct as a special statute, the court infers that the Legislature intended that conduct to be prosecuted exclusively under the special statute. In effect, the special statute is interpreted as creating an exception to the general statute for conduct that otherwise could be prosecuted under either statute. [Citation.] 'The rule is not one of constitutional or statutory mandate, but serves as an aid to judicial interpretation when two statutes conflict.' [Citation.] 'The doctrine that a specific statute precludes any prosecution under a general statute is a rule designed to ascertain and carry out legislative intent. The fact that the Legislature has enacted a specific statute covering much the same ground as a more general law is a powerful indication that the Legislature intended the specific provision alone to apply. Indeed, in most instances, an overlap of provisions is determinative of the issue of legislative intent and "requires us to give effect to the special provision alone in the face of the dual applicability of the general provision ... and the special provision ...." ' " ( People v. Murphy (2011) 52 Cal.4th 81, 86, 127 Cal.Rptr.3d 78, 253 P.3d 1216 ( Murphy ), italics added.)
"Absent some indication of legislative intent to the contrary, the Williamson rule applies when (1) 'each element of the general statute corresponds to an element on the face of the special statute' or (2) when 'it appears from the statutory context that a violation of the special statute will necessarily or commonly result in a violation of the general statute.' [Citation.
*728 ] In its clearest application, the rule is triggered when a violation of a provision of the special statute would inevitably constitute a violation of the general statute." ( Murphy, supra , 52 Cal.4th at p. 86, 127 Cal.Rptr.3d 78, 253 P.3d 1216.)
"On the other hand, if the more general statute contains an element that is not contained in the special statute and that element would not commonly occur in the context of a violation of the special statute, we do not assume that the Legislature intended to preclude prosecution under the general statute. In such situations, because the general statute contemplates more culpable conduct, it is reasonable to infer that the Legislature intended to punish such conduct more severely." ( Murphy, supra , 52 Cal.4th at p. 87, 127 Cal.Rptr.3d 78, 253 P.3d 1216.)
"However, that the general statute contains an element not within the special statute does not necessarily mean that the Williamson rule does not apply. 'It is not correct to assume that the [ Williamson ] rule is inapplicable whenever the general statute contains an element not found within the four *622 corners of the "special" law. Rather, the courts must consider the context in which the statutes are placed. If it appears from the entire context that a violation of the "special" statute will necessarily or commonly result in a violation of the "general" statute, the Williamson rule may apply even though the elements of the general statute are not mirrored on the face of the special statute.' " ( Murphy, supra , 52 Cal.4th at p. 87, 127 Cal.Rptr.3d 78, 253 P.3d 1216.)
The underlying rationale of the Williamson rule reveals something pertinent to our analysis here the parties have not mentioned. In discussing the underlying rationale for the rule, our high court has stated: "In adopting a specific statute, the Legislature has focused its attention on a particular type of conduct and has identified that conduct as deserving a particular punishment. Consequently, we infer that the Legislature intended that such conduct should be punished under the special statute and not under a more general statute." ( Murphy , supra , 52 Cal.4th at p. 91, 127 Cal.Rptr.3d 78, 253 P.3d 1216, italics added.) The focus on the defendant's conduct is important. Because the Williamson rule "prohibits prosecution under a general statute when the conduct at issue is covered under a more specific statute " ( People v. Henry (2018) 28 Cal.App.5th 786, 789, 239 Cal.Rptr.3d 483, italics added), a necessary predicate to the application of the rule is that the defendant's conduct fits the elements of the assertedly more specific statute. Here, defendant's conduct is not covered by the statutes defendant relies upon and thus, defendant could not be convicted under either statute.
Section 530 provides: "Every person who falsely personates another, in either his private or official capacity, and in such assumed character receives any money or property, knowing that it is intended to be delivered to the individual so personated , with intent to convert the same to his own use, or to that of another person, or to deprive the true owner thereof, is punishable in the same manner and to the same extent as for larceny of the money or property so received."[12] (Italics added.)
*729 Defendant asserts that section 530 "is precisely what happened here." We disagree. As can be seen by the italicized text, this statute does not cover defendant's conduct. Defendant did not *623 receive property; he took it. Moreover, there is no evidence the victims intended to deliver their money and property to the person defendant personated, let alone defendant's knowledge of such intent. The evidence simply does support a finding that defendant committed a violation of section 530.[13]
Defendant's section 532 theory fails for the same reason. Section 532, subdivision (a), provides, in pertinent part: "Every person who knowingly and designedly, by any false or fraudulent representation or pretense, defrauds any other person of money, labor, or property, whether real or personal, or who causes or procures others to report falsely of his or her wealth or mercantile character, and by thus imposing upon any person obtains credit, and thereby fraudulently gets possession of money or property, or obtains the labor or service of another, is punishable in the same manner and to the same extent as for larceny of the money or property so obtained." Again, defendant asserts that section 532 "is precisely what happened here." Again, defendant is wrong.
As defendant notes, the elements of theft by false pretense were set forth by the court in People v. Wooten (1996) 44 Cal.App.4th 1834, 52 Cal.Rptr.2d 765 : "(1) the defendant made a false pretense or representation to the owner of property; (2) with the intent to defraud the owner of that property; and (3) the owner transferred the property to the defendant in reliance on the representation." ( Id. at p. 1842, 52 Cal.Rptr.2d 765.) Thus, theft by false pretenses under section 532 "is the consensual but fraudulent acquisition of property from its owner." ( Bell v. Feibush (2013) 212 Cal.App.4th 1041, 1049, 151 Cal.Rptr.3d 546 ; see also People v. Kaufman (2017) 17 Cal.App.5th 370, 380, 225 Cal.Rptr.3d 334 [false pretenses under section 484 also involves the consensual transfer of property].) Here, again, there was no consensual transfer of property. Defendant took the property.
Defendant's conduct is not covered by sections 530 or 532. Thus, he could not be convicted of these assertedly more specific statutes. Accordingly, a prosecution for robbery cannot be preempted under the Williamson rule by offenses defendant did not commit.
*624 Additionally, we note that robbery is both a serious and violent felony offense. (§§ 667.5, subd. (c)(9); 1192.7, subd. (c)(19).) Therefore, here, we do not assume that the Legislature intended to preclude prosecution under that assertedly general statute. Rather, "because the general statute [robbery] contemplates more culpable conduct, it is reasonable to infer that the Legislature intended to punish such conduct more severely." ( Murphy, supra , 52 Cal.4th at p. 87, 127 Cal.Rptr.3d 78, 253 P.3d 1216 ; see also People v. Watson (1981) 30 Cal.3d 290, 297, 179 Cal.Rptr. 43, 637 P.2d 279 [prosecution for second degree murder under an implied malice theory for vehicular homicide not preempted by the offense of vehicular manslaughter with gross negligence because the prosecution is required to show a higher degree of *730 culpability in support of a second degree murder charge than required to establish vehicular manslaughter; because the two crimes contemplate different kinds of culpability or criminal activity, the Williamson rule does not preclude a second degree murder charge].)
We conclude that the Williamson rule is inapplicable here.
III.-VIII.**
DISPOSITION
The judgment is modified to: (1) strike the section 667, subdivision (a)(1), enhancements imposed on count 2 and imposed and stayed on count 3; (2) strike the section 667.5, subdivision (b), enhancement; and (3) stay execution of the sentences imposed on counts 8 and 9 pursuant to section 654. The matter is remanded for the trial court to determine whether it should exercise its newly authorized discretion to dismiss or strike the remaining section 667, subdivision (a)(1), enhancement pursuant to section 1385, and to select and impose a full-term sentence on count 3, burglary in the first degree, and then stay execution of that sentence pursuant to section 654. As modified, the judgment is affirmed.
The trial court is directed to prepare an amended abstract of judgment to reflect these modifications, the trial court's new sentencing, and to indicate stayed execution of the sentences imposed on all counts stayed pursuant to *625 section 654. The trial court is further directed to forward a copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.
We concur:
BLEASE, Acting P. J.
HULL, J.

Further undesignated statutory references are to the Penal Code in effect at the time of the charged offenses.

The officer who interviewed I.A. testified that his recollection was that he asked I.A. whether she saw the woman with a gun and that I.A. responded that she did not.

We have listened to the audio recording of the 911 call. There are discrepancies between the audio recording and the transcript of the 911 call, which was not admitted into evidence. At this point in the 911 call, the transcript inaccurately states that J.N. "went down here to use a telephone to report it," instead of "raced down here." (Italics added.)

The transcript indicates that J.N. stated that the man "acted as if he was a policeman, got me out of my car uh, pushed me ... " instead of "frisked me." (Italics added.)

J.N.'s unavailability is not challenged in this appeal. The prosecutor explained during in limine motions that J.N. was receiving cancer treatment and lived out of state.

Ortega testified that she did not remember the date of this incident. Earlier, when she testified about J.N., she said it was hard to remember the location "because so many."

The trial court granted defendant's Romero motion (People v. Superior Court (Romero) (1996) 13 Cal.4th 497, 53 Cal.Rptr.2d 789, 917 P.2d 628 ) to strike one of the prior strike enhancement allegations. The trial court struck the enhancement which was based on a 1983 aggravated kidnapping conviction.

Defendant requested that the trial court impose only one five-year enhancement pursuant to section 667, subdivision (a)(1). However, the court stated that section 1385 specifically precluded it from dismissing an enhancement under section 667, subdivision (a)(1). The court stated that it did not believe it had the authority to grant defendant's request. We discuss this further in part V. of the Discussion, post.

The trial court had granted defendant's request that count 4 be redesignated a misdemeanor.

In addition to a substantial evidence review, the Morehead court concluded that the trial court did not have a sua sponte duty to amplify the robbery instruction by telling the jury that each victim's fear had to be both actual and reasonable. (Morehead, supra , 191 Cal.App.4th at p. 774, 119 Cal.Rptr.3d 680.) The court then went on to hold that any error in not so instructing the jury was harmless because the evidence in the case supported a finding that their fear was indeed both actual and reasonable. (Id. at pp. 774-777, 119 Cal.Rptr.3d 680.)

The trial court instructed the jury as follows: "The defendant is charged in Counts 1 and 2 with robbery. To prove that the defendant is guilty of this crime, the People must prove that: [¶] One, the defendant took property that was not his own; [¶] Two, the property was in the possession of another person; [¶] Three, the property was taken from the other person or his or her immediate presence; [¶] Four, the property was taken against that person's will; [¶] Five, the defendant used force or fear to take the property or to prevent the person from resisting; and [¶] Six, when defendant used force or fear to take the property, he intended to deprive the owner of it permanently. [¶] The defendant's intent to take the property must have been formed before or during the time he used force or fear. If the defendant did not form this required intent until after using the force or fear, then he did not commit robbery. [¶] The property taken can be of any value, however, slight. [¶] Fear as used here means fear of injury to the person himself or herself." (CALCRIM No. 1600, as given)

There are no published cases setting forth the elements of section 530. However, CALCRIM No. 2044 does. That instruction lists the following elements: "1. The defendant falsely impersonated another person in the other person's private or official capacity; [¶] 2. While falsely impersonating that person, the defendant: [¶] 2E. Received money or property; [¶] 2F. The defendant knew that the money or property was intended to be delivered to the person that (he/she) was falsely impersonating; [¶] 2G. The money or property was worth (more than $ 950/$ 950 or less); [¶] 2H. When the defendant acted, (he/she) intended to deprive the true owner of the money or property, or use it for (his/her) own benefit, or let someone else use it." (Italics added.)

We disagree with the People's unwarranted concession that the facts here arguably could support false personation convictions.

See footnote *, ante .