5/1/25

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>v.<br><br>KIMESHA MONAE WILLIAMS et al.,<br><br>　　Defendants and Appellants. | E081147<br><br>(Super.Ct.No. SWF1907576)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County. Timothy F. Freer, Judge. Affirmed with directions.

Patricia L. Brisbois, under appointment by the Court of Appeal, for Defendant and Appellant Kimesha Monae Williams.

Ronda G. Norris, under appointment by the Court of Appeal, for Defendant and Appellant Candace Tai Townsel.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting and Kristen Ramirez, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found defendants and appellants Kimesha Williams (Williams) and Candace Tai Townsel (Townsel), guilty of felony murder (Pen. Code, § 187, subd. (a)), robbery (§ 211), and elder abuse (§ 368, subd. (b)(1)).[1]  As to the murder, the jury found true the special circumstance that the murder occurred during the robbery.  (§ 190.2, subd. (a)(17)(A).)  In regard to the elder abuse, the jury found true the allegation that the victim was over 70 years old, and the abuse caused the victim's death.  (§ 368, subd. (b)(3)(B).)  The trial court sentenced Williams and Townsel (collectively, defendants) to prison for life without the possibility of parole.

There are five issues on appeal.  First, defendants contend substantial evidence does not support the finding that force or fear was used in stealing the victim's property.  Second, Townsel asserts there is insufficient evidence to support the finding that she aided and abetted robbery, as opposed to theft.  Third, Townsel contends substantial evidence does not support the finding that she acted with reckless indifference, as required for her felony murder conviction.  Fourth, defendants assert the trial court made an error in the elder abuse jury instruction.  Fifth, Williams contends the suspended parole revocation fine must be stricken.  We strike the parole revocation fines with directions and otherwise affirm.

## FACTS

In 2019, the victim was 84 years old, and her husband (Husband) was 93 years old.  The victim was five feet four inches tall and weighed 164 pounds.  On August 31,

---

[1]  All subsequent statutory references will be to the Penal Code unless otherwise indicated.

2019, at 7:27 A.M.[2], the victim's daughter dropped off the victim and Husband in the valet area of Pechanga Casino. At 7:28, the victim and Husband walked toward the restrooms that are inside the casino next to the valet entrance/exit.

At that time, defendants were exiting the casino through the valet exit. Defendants paused at the exit doors to watch the victim and Husband walk toward the restroom. The victim had a pink purse with the strap over her left forearm. Inside the purse, the victim had $500 cash for herself and $400 cash for Husband to gamble with at the casino. Defendants turned away from the exit and followed the victim to the women's restroom.

At 7:28:37, the victim entered the restroom. Defendants followed the victim, but stopped outside the restroom, by the restroom entrance. At 7:29:07, Ms. Wise entered the same women's restroom. Wise walked past defendants, who were still at the entrance and went to a stall.

At 7:30:35, Ms. Mitchell entered the same women's restroom. Mitchell saw Williams standing in the restroom looking at a closed stall door. Mitchell walked past Williams to an empty stall. Mitchell did not see Townsel in the restroom.

When Wise opened her stall door, defendants were "right outside [Wise's] stall," approximately two to three feet from the stall door. Townsel was standing, while Williams was crouched and appeared to be "sticking something in her pants." Wise said, " 'Hi.' " Williams looked up toward Wise and said, " 'Hi.' " Wise immediately

---

[2] All times given in this opinion are A.M.

3

exited the restroom, which was at 7:31:28. At that same time, Husband exited the men's restroom.

Mitchell, who was in a stall, heard the sound of a person briefly gagging, then someone made a whispering sound like " 'pshh, pshh, pshh' " for approximately one second, and then a loud thud. Mitchell estimated that approximately 30 seconds after she sat down on the toilet, she heard the gagging sound. Approximately 30 to 45 seconds after that, she heard the whispering sound. Approximately 15 to 20 seconds later, she heard the thud.

At 7:32:11, Townsel exited the restroom and walked toward the valet exit doors. Townsel paused by the exit and looked back toward the restroom, as though expecting Williams. Williams did not appear. At 7:32:27, Townsel saw a female janitor, in uniform, walking toward the restroom. Townsel turned and walked back toward the restroom, in front of the janitor. Before the janitor could enter the restroom, Townsel paused and loudly asked the janitor, "Do you work here?" The janitor, who felt physically blocked by Townsel from entering the restroom, said she did work at the casino. At 7:32:42, Williams exited the restroom, and defendants immediately left the casino.

The janitor entered the restroom and found the victim on the floor. The janitor did not see a purse near the victim. At 7:32:51, the janitor left the restroom to find security officers. Upon finding a security officer in the valet area of the casino, the janitor advised the officer to watch defendants, who were leaving the casino's property and told him the victim needed help.

4

When Mitchell exited the stall, she saw the victim on the floor not moving. Mitchell did not see a purse near the victim. Mitchell went to find security officers. At 7:33, casino security entered the restroom. A casino public safety detective, who investigates criminal activity, arrived at the restroom while paramedics were treating the victim. The detective did not see a purse near the victim. The victim's purse was not found.

The victim was taken to a hospital. She did not speak while in the ambulance. She "had extensive injuries to her scalp and her left arm." The victim suffered (1) a laceration to the back of her scalp; (2) a fracture radiating around the base of her skull (from ear to ear); and (3) a "three-and-a-half-inch long by . . . three-quarter-inch-wide" tear of the skin on her left forearm (where the skin tore away from the underlying tissue) with bruising underneath the tear. The victim suffered a significant subdural hematoma and "bleeding within the actual tissue of the brain." There were no other injuries to the backside of the victim's body.

The victim died after several days of hospitalization. The victim's "cause of death was blunt impact injuries to [her] head." Specifically, she suffered a single impact to the back of her skull, consistent with falling backward. Typically, when a person falls due to an issue such as fainting, "they collapse to the ground, they don't fall straight back." The victim's "injuries were akin to those also seen in automobile accidents." The injury to the victim's forearm was caused by a "kind of scraping or movement across the forearm." The forearm injury could be consistent with a strap being forcibly pulled across the victim's forearm.

5

At trial, the prosecutor proceeded on the theory that Williams was the direct perpetrator of the robbery and murder, while Townsel aided and abetted Williams.

## DISCUSSION

A.    BOTH DEFENDANTS:  SUFFICIENCY OF THE EVIDENCE FOR FORCE

Defendants contend there is insufficient evidence that the victim's purse was taken by force or fear.

We "examine ' "the entire record in the light most favorable to the judgment" ' to determine whether it discloses substantial evidence—' "evidence that is reasonable, credible, and of solid value" '—' "from which a reasonable trier of fact could find the defendant[s] guilty beyond a reasonable doubt." '  [Citation.]  Our review ' " 'presume[s] in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence.' "  [Citation.]  Even where, as here, the evidence of guilt is largely circumstantial, our task is not to resolve credibility issues or evidentiary conflicts, nor is it to inquire whether the evidence might " ' "be reasonably reconciled with the defendant[s'] innocence." ' " '  [Citation.]  Instead, we ask whether there is ' " 'substantial evidence of the existence of each element of the offense charged' " ' such that any rational jury may have convicted defendant[s]." (*People v. Veamatahau* (2020) 9 Cal.5th 16, 35-36.)

Robbery requires that property be taken " 'either by force *or* by fear.' " (*People v. Montalvo* (2019) 36 Cal.App.5th 597, 611; § 211. ) "In terms of the amount of force required to elevate a taking to a robbery, 'something more is required than just that

6

quantum of force which is necessary to accomplish the mere seizing of the property.' "
(*People v. Lopez* (2017) 8 Cal.App.5th 1230, 1235.)

"[T]he defendant's physical characteristics in comparison to those of the victim may . . . be particularly relevant in determining whether the physical act applied by the defendant to the victim constituted 'force.' A shove by a defendant who is larger or stronger than h[er] victim may lead a jury to find that the shove amounted to the necessary 'force.' " (*People v. Mungia* (1991) 234 Cal.App.3d 1703, 1709; see also *People v. Mullins* (2018) 19 Cal.App.5th 594, 608-610.)

The victim was 84 years old, five feet-four inches tall, weighed 164 pounds, and was "frail." Williams was approximately six feet tall.[3] Williams was "big"; she was "heavier" and "larger" than Townsel. Williams's "heavy set" build was "intimidating" to Mitchell who was five-feet-four-inches tall – the same height as the victim. In videos from the casino's security cameras, Williams appears to be younger than 50 years old.

When entering the restroom, the victim's purse strap was over her left forearm. When the victim was found, within seconds of Williams leaving the restroom, the victim no longer had her purse, and she suffered an injury to her left forearm. The injury involved the victim's skin being torn away from the underlying tissue and bruising underneath the tear. There was evidence that pulling a strap across the victim's arm could have caused the forearm injury.

---

[3] In the People's Respondent's Brief, they take defendants' heights and weights from defendants' probation reports. We cannot use a probation report in a substantial evidence analysis because we must limit ourselves to the evidence presented to the jury. (*People v. Orloff* (2016) 2 Cal.App.5th 947, 950, fn. 2.)

Additionally, the victim suffered a large skull fracture that radiated from ear to ear across the base of her skull. Only one point on the backside of the victim's body was injured—her head. A forensic pathologist, who conducted the victim's autopsy, explained that the victim fell straight backward, without her arms or anything else breaking her fall. The victim went "from standing height, directly [to] impacting [her] head." The forensic pathologist testified that an accelerating force "would increase the chances of more severe injuries, as in this case." The pathologist opined that the victim's injuries were like those seen in car crash cases.

In looking at the foregoing evidence in the light most favorable to the judgment, one can reasonably infer that Williams violently pulled the purse from the victim's forearm while shoving the victim backward causing the back of her head to strike the ground with a significant impact. The force exerted resulted in injuries akin to a car crash, which is more force than was necessary to take a purse from the 84-year-old victim. Accordingly, substantial evidence supports the finding that force was used during the taking of the purse.

Defendants contend, "None of the witnesses saw [the victim's] purse being taken. No one could say whether it was removed from her person or taken while she was still inside a stall or removed from the counter as she washed her hands." The victim was carrying her purse on her left forearm when entering the restroom. The victim sustained an injury to her left forearm that can be explained by a strap being pulled across the victim's arm. That evidence supports the finding that the victim's

8

purse was violently taken from her forearm.  Therefore, we find defendants' argument unpersuasive.

B.    <u>TOWNSEL:  SUFFICIENCY OF THE EVIDENCE FOR AIDING AND ABETTING</u>

Townsel contends substantial evidence does not support the finding that she aided and abetted robbery, as opposed to theft.  In other words, Townsel does not dispute that she knew a theft would take place, but she disputes aiding and abetting the use of force.

"[A]n aider and abettor is a person who, 'acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime.' "  (*People v. Prettyman* (1996) 14 Cal.4th 248, 259.)

As set forth *ante*, the victim was 84 years old, five-feet-four-inches tall, weighed 164 pounds, and was "frail."  Williams was approximately six feet tall and "heavyset."  Williams's physical size was "intimidating" to Mitchell who was the same height as the victim.  In videos from the casino's security cameras, Williams appears to be younger than 50 years old.

When Townsel observed the victim walking toward the restroom, the victim had her purse strap over her forearm.  That means Townsel could anticipate that Williams would have to snatch the purse from the victim's body.  Given the size and age differences between Williams and the victim, it would be nearly impossible for force

9

not to be used in the taking of the purse. Therefore, the jury could reasonably conclude that Townsel knew and intended for force to be used against the victim in the taking of the purse.

Townsel points to the evidence that she and Williams committed thefts in the past that did not involve force to support her argument that she did not expect force to be used against the victim. In one incident highlighted by Townsel, Williams snatched money from the hand of Ms. LaBauve, who worked as an exotic dancer at a gentlemen's club. From the evidence that LaBauve worked as an exotic dancer, one can infer that she was not elderly or frail. Further, LaBauve's cash was in her hand, requiring little force to take it. By comparison, the victim's purse strap was over her forearm, requiring force to remove it. Thus, the two crimes are not sufficiently similar. It was the victim's size and physical condition compared to that of Williams, plus the purse strap being over the victim's arm, that alerted Townsel to the force that would be exerted against the victim when Williams violently took the purse from the victim's arm.

Townsel further asserts that there is insufficient evidence that she conspired to rob the victim. Because we conclude there is sufficient evidence to support a finding of aiding and abetting, we do not address Townsel's contention concerning conspiracy.

10

C. TOWNSEL: SUFFICIENCY OF THE EVIDENCE FOR RECKLESS INDIFFERENCE

1. *LAW*

"Defendants who were neither actual killers nor acted with the intent to kill can be held liable for murder only if they were 'major participant[s] in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of [Penal Code] Section 190.2'—that is, the statute defining the felony-murder special circumstance." (*People v. Strong* (2022) 13 Cal.5th 698, 708.)

"Reckless indifference to human life is 'implicit in knowingly engaging in criminal activities known to carry a grave risk of death.' " (*In re Scoggins* (2020) 9 Cal.5th 667, 676 (*Scoggins*).) "Reckless indifference to human life has a subjective and an objective element." (*Id.* at p. 677.)

2. *CONTENTION*

Townsel concedes that she was a major participant in the robbery but contends substantial evidence does not support the finding that she acted with reckless indifference to human life. Typically, "the greater the defendant's participation in the felony murder, the more likely that [s]he acted with reckless indifference to human life." (*Tison v. Arizona* (1987) 481 U.S. 137, 153 (*Tison*); *People v. Clark* (2016) 63 Cal.4th 522, 615 (*Clark*).) Although the two elements tend to be interrelated, we will analyze the reckless indifference evidence apart from Townsel's concession that she was a major participant in the robbery.

### 3. *SUBJECTIVE ELEMENT*

#### a. Law

"As to the subjective element, '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.' " (*Scoggins*, *supra*, 9 Cal.5th at p. 677.)

In *Tison*, *supra*, 481 U.S. 137, a group of people conducted a prison escape. (*Id.* at p. 139.) The group then carjacked a family and held them hostage. (*Id.* at pp. 139-140.) Upon stopping the hostages' vehicle, part of the group stayed with the hostages, while another part of the group walked to a nearby area to retrieve water. (*Id.* at pp. 140-141.) The people who went to retrieve the water (the Water Group) heard gunshots and saw one of their confederates (the Murderer) killing the hostages. (*Id.* at p. 141.)

The United States Supreme Court observed that the Water Group had provided guns to the Murderer to aid in the prison escape; the Water Group participated in the carjacking; the Water Group "stood by and watched the killing, making no effort to assist the victims before, during, or after the shooting. Instead, [they] chose to assist the killers in their continuing criminal endeavors." (*Tison*, *supra*, 481 U.S. at p. 151.) The Court reasoned, "These facts not only indicate that the [Water Group's] participation in the crime was anything but minor; they also would clearly support a finding that [the Water Group] subjectively appreciated that their acts were likely to result in the taking of innocent life." (*Id.* at p. 152.)

In examining *Tison*, the California Supreme Court wrote, "In *Tison*, the high court noted this failure to render aid; after the shooting, '[n]either [of the [Water Group's members]] made an effort to help the victims.' [Citation.] Other appellate courts have considered relevant a defendant's failure to provide aid while present at the scene. The Supreme Court of Arizona, in affirming that a defendant had acted with reckless indifference to human life, noted that the defendant had 'failed to render aid knowing that one victim might not be dead.' " (*Clark*, *supra*, 63 Cal.4th 522, 619.)

### b. Timeline: Townsel Witnessed the Violence

Wise exited the restroom at 7:31:28. Wise did not see the victim. Townsel exited the restroom at 7:32:11, which was 43 seconds after Wise exited the restroom. The victim's injuries indicate that her purse was snatched from her arm, and she was pushed backward. Those actions would have taken less than 43 seconds, which means Townsel had plenty of time inside the restroom to participate in the robbery.

Further support for Townsel having been in the restroom during the robbery is Townsel's actions when she initially exited the restroom: At 7:32:11, Townsel exited the restroom walking toward the valet exit. Five seconds later, at 7:32:16, Townsel looked back over her shoulder, toward the restroom, as though expecting Williams to be behind her. Townsel continued walking to the valet exit, and at 7:32:21, she paused at the exit doors and looked toward the restroom. Townsel lingered at the doors looking toward the restroom, as though expecting Williams to exit. At 7:32:27, Townsel saw the janitor walking toward the restroom and moved to block her from entering the restroom.

Townsel's actions indicate that she thought the robbery was complete when she initially exited the restroom at 7:32:11. Townsel walked to the exit, expecting Williams to be behind her so they could leave. If Townsel left the restroom to serve as a lookout for a robbery that had not yet happened, then logic dictates that she would have stayed closer to the restroom to more easily intercept people like the janitor. Townsel's actions of walking toward the exit and repeatedly looking back for Williams support the conclusion that the robbery was complete before Townsel initially left the restroom.

Townsel contends substantial evidence does not support the finding that she was in the restroom when the victim fell. Townsel asserts Mitchell first heard the gagging sound "30 seconds after she went in the stall, the second set of sounds 30 or 45 seconds after that, and then the 'thud' 15 or 20 seconds after that, for a total of 1 minute and 15 seconds to 35 seconds." Mitchell entered the restroom at 7:30:35, if one adds 20 seconds for Mitchell to walk to a stall and sit down, that would be 7:31:25. Adding 75 seconds to that would be 7:32:40. Townsel exited the restroom at 7:32:11, so Townsel asserts she was not in the restroom when the victim fell.

Mitchell testified that her timeline was an estimation. The jury could have rejected Mitchell's estimations on the basis that snatching the victim's purse from her arm and pushing her backward did not take 75 seconds. Given the evidence of the victim's injuries, the jury could reasonably conclude that Mitchell's timeline was too lengthy, and the robbery was over when Townsel initially exited the restroom.

c.      Reckless Indifference Factors

With the understanding that Townsel was in the restroom during the robbery, we will address the factors that are relevant to a reckless indifference analysis.

The first factor is Townsel's knowledge of weapons to be used in the robbery. (*Clark*, *supra*, 63 Cal.4th at p. 618.)  There is no evidence of weapons having been used in the robbery.  However, Townsel observed the victim and therefore saw that Williams was significantly taller, heavier, and younger than the victim.

The second factor is Townsel's physical presence at the robbery and the opportunities she had to aid the victim.  (*Clark*, *supra*, 63 Cal.4th at p. 619.)  Townsel was present at the robbery.  One can reasonably deduce she saw the victim on the floor, not moving.  Townsel left the restroom but did not seek help for the victim.  Rather, Townsel actively slowed the progress of a janitor entering the restroom until Williams exited the restroom.  Thus, Townsel was present, did not aid the victim, and actively impeded the victim from receiving aid.

The third factor is the duration of the robbery.  The longer an underlying felony lasts, the greater the chance for violence to occur.  (*Clark*, *supra*, 63 Cal.4th at p. 620.)  From the time Townsel noticed the victim to the time Townsel exited the casino was approximately five minutes.  The evidence supports the robbery lasting less than 43 seconds.  Thus, the robbery was quick.

The fourth factor is Townsel's knowledge of the likelihood of Williams using lethal force.  (*Clark*, *supra*, 63 Cal.4th at p. 621.)  "A defendant's willingness to engage in a[] . . . robbery with individuals known to h[er] to use lethal force may give rise to the

inference that the defendant disregarded a 'grave risk of death.' " (*Ibid.*) There is no evidence that Townsel was aware of Williams having a propensity to kill.

The fifth factor is Townsel's efforts to minimize the risks of violence. (*Clark*, *supra*, 63 Cal.4th at pp. 621-622.) There is no evidence of Townsel trying to minimize the risks of violence. For example, Townsel, who was physically smaller than Williams, did not take the direct perpetrator role in order to minimize the risk of the victim being harmed by Williams during the robbery.

The factors most favorable to Townsel are her lack of knowledge that Williams would use lethal force and the quickness of the robbery. One could reasonably find that, prior to the robbery, Townsel had little reason to know of the grave risk to the victim.

However, "[t]he taking element of robbery itself has two necessary elements, gaining possession of the victim's property and asporting or carrying away the loot." (*People v. Cooper* (1991) 53 Cal.3d 1158, 1165.) "For purposes of determining liability as an aider and abettor, the commission of [a] robbery continues only so long as the loot is being carried away to a place of temporary safety." (*Id.* at pp. 1169-1170.) One can reasonably deduce that during the robbery, Townsel saw the 84-year-old victim on the ground not moving. At that point, Townsel knew the victim was at grave risk. Townsel did not seek aid for the victim, rather, Townsel actively impeded aid from reaching the victim so the robbery could be completed, and she and Williams could escape with the purse.

16

Townsel's actions support a finding that she approved of the violent manner in which the robbery was committed because she did not seek aid for the victim and instead chose to further the robbery by blocking the janitor's path. Townsel's act of impeding help from reaching the victim also supports a finding that Townsel consciously disregarded the risk of death to the victim.

4.    *OBJECTIVE ELEMENT*

"As to the objective element, ' "[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." ' " (*Scoggins* (2020) 9 Cal.5th 667, 677.)

When the janitor saw the victim on the floor, she immediately went to find help for the victim. When Mitchell saw the victim on the floor, she too immediately went to find help. This evidence supports the finding that a reasonable person would not disregard seeing an 84-year-old woman on the ground not moving. Townsel's acts of not seeking aid and impeding the janitor from entering the restroom are a gross deviation from the conduct of a reasonable person.

5.    *CONCLUSION*

By not seeking help for the victim and actively impeding the janitor's path, Townsel consciously disregarded the grave risk to the victim and grossly deviated from the conduct of a reasonable person. Thus, substantial evidence supports the finding of Townsel's reckless indifference.

17

D.    BOTH DEFENDANTS:  ELDER ABUSE INSTRUCTION

1.    *INSTRUCTION*

For the elder abuse charge, the trial court instructed the jury, in relevant part, as follows:  "The defendants are charged in Count Three with elder abuse likely to produce great bodily harm or death in violation of Penal Code section 368(b)(1).

"To prove that a defendant is guilty of this crime, the People must prove that:

"1.    The defendant willfully inflicted unjustifiable physical pain or mental suffering on [the victim];

"2.    The defendant inflicted suffering on [the victim] or caused or *permitted* [the victim] to suffer, be injured, or be endangered under circumstances or conditions likely to produce great bodily harm or death."  (CALCRIM No. 830, italics added.)

2.    *ANALYSIS*

Defendants contend the trial court erred by including the word "permitted" in the instruction because it effectively removed the causation element, allowing the jury to convict defendants if they did not prevent the victim from falling.[4]

The elder abuse statute also uses the word "permits":  "A person who knows or reasonably should know that a person is an elder or dependent adult and who, under circumstances or conditions likely to produce great bodily harm or death, willfully

_____

[4] The People contend defendants forfeited this issue by failing to object in the trial court.  " 'Failure to object to instructional error forfeits the issue on appeal unless the error affects defendant's substantial rights.' "  (*People v. Burton* (2018) 29 Cal.App.5th 917, 923.)  A defendant's substantial rights are impacted if the error is prejudicial under the standard of *People v. Watson* (1956) 46 Cal.2d 818.  (*Burton*, at p. 923.)  We choose to address the issue on the merits.

18

causes or *permits* any elder or dependent adult to suffer, or inflicts thereon unjustifiable physical pain or mental suffering." (§ 368, subd. (b)(1), italics added.) "Under this statutory language, the class of potential defendants includes both those who directly inflict the abuse as well as those who passively fail to act." (*People v. Heitzman* (1994) 9 Cal.4th 189, 214.) "[I]n order for criminal liability to attach under section 368(a) for willfully permitting the infliction of physical pain or mental suffering on an elder, a defendant must first be under a legal duty to act." (*Id.* at p. 199.) For the sake of judicial efficiency, we will assume, without deciding, that including the words "or permitted" in the instruction was erroneous because defendants did not have a legal duty to protect the victim.

In our prejudice analysis, we examine whether the jury's other verdicts leave no reasonable doubt that the jury found defendants caused the victim's injuries and death. (*People v. Aledamat* (2019) 8 Cal.5th 1, 10.)

For the elder abuse enhancement (§ 368, subd. (b)(3)(B)), the jury was instructed, in relevant part: "The defendants are charged with the additional allegation that they proximately caused the death of a person that was 70 years of age or older.

"To prove that a defendant is guilty of this allegation the People must prove that:

"1.     The defendant proximately caused the death of the [victim];

"AND

"2.     [The victim] was 70 years of age or older." The jury found the enhancement true. Thus, the jury found that defendants caused the victim's death.

For the murder special circumstance (§ 190.2, subd. (a)(17)), the jury was instructed that one element was: "A defendant did an act that caused the death of another person." (CALCRIM No. 730.) The jury found the special circumstance true. Thus, the jury found defendants performed an act that caused the victim's death.

For the robbery, the jury was instructed, in relevant part: "The defendant used force or fear to take the property or to prevent the person from resisting." (CALCRIM No. 1600.) The jury was also instructed on theft by larceny, i.e., without force (CALCRIM No. 1800; § 484), as a lesser included offense of robbery. The jury found defendants guilty of robbery. As set forth *ante*, there is substantial evidence of force having been used against the victim. Thus, one can conclude beyond a reasonable doubt that the jury found defendants used force.

We conclude beyond a reasonable doubt that the presumed instructional error was harmless because the jury found that defendants used force in causing the victim to fall, which means the jury did not convict defendants of elder abuse on a theory that they merely failed to prevent her from falling.

E.      BOTH DEFENDANTS:  PAROLE REVOCATION FINE

Williams contends the parole revocation fine (§ 1202.45, subd. (a)), which was imposed and suspended, should be stricken. The People concede Williams is correct and assert the fine should be stricken for Townsel as well. Williams is correct that, because she was sentenced to prison for life without the possibility of parole, her parole revocation fine should be stricken. (*People v. Coleman* (2024) 98 Cal.App.5th 709, 725.) We will strike the fine for Williams and direct the trial court to issue a new

20

abstract of judgment. Because the People concede the same should occur for Townsel, we will also strike her fine and direct a new abstract be issued.

## DISPOSITION

The parole revocation fines (§ 1202.45, subd. (a)) are stricken for both defendants. The trial court is directed to issue amended abstracts of judgment for both defendants striking the parole revocation fines (§ 1202.45, subd. (a)) and forward the amended abstracts to the Department of Corrections and Rehabilitation. In all other respects, the judgments are affirmed.

CERTIFIED FOR PUBLICATION

MILLER
J.

We concur:

RAMIREZ
P. J.

McKINSTER
J.

21