Filed 10/31/25  P. v. Townsel CA4/2
Opinion following transfer from Supreme Court

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E081147 |
| v. | (Super.Ct.No. SWF1907576) |
| CANDACE TAI TOWNSEL, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Timothy F. Freer, Judge.  Affirmed with directions.

Ronda G. Norris, under appointment by the Court of Appeal, for Defendant and Appellant Candace Tai Townsel.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting and Kristen Ramirez, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury found defendant and appellant Candace Tai Townsel guilty of felony murder (Pen. Code, § 187, subd. (a)), robbery (§ 211), and elder abuse (§ 368, subd. (b)(1)).[1] As to the murder, the jury found true the special circumstance that the murder occurred during the robbery. (§ 190.2, subd. (a)(17)(A).) In regard to the elder abuse, the jury found true the allegation that the victim was over 70 years old, and the abuse caused the victim's death. (§ 368, subd. (b)(3)(B).) The trial court sentenced defendant to prison for life without the possibility of parole.

There are five issues on appeal. First, defendant contends substantial evidence does not support the finding that force or fear was used in stealing the victim's property. Second, defendant asserts there is insufficient evidence to support the finding that she aided and abetted robbery, as opposed to theft. Third, defendant contends substantial evidence does not support the finding that she acted with reckless indifference, as required for her felony murder conviction. Fourth, defendant asserts the trial court made an error in the elder abuse jury instruction. Fifth, Kimesha Williams (Williams), who was defendant's codefendant, asserted in her appeal that the suspended parole revocation fine must be stricken, and the People conceded that contention was correct as to defendant as well.[2] We strike the parole revocation fine with directions and otherwise affirm.

_____

[1] All subsequent statutory references will be to the Penal Code unless otherwise indicated.

[2] The California Supreme Court denied Williams's petition for review on July 24, 2025. This court issued a partial remittitur as to Williams's appeal only, on October 3, 2025.

## FACTS

In 2019, the victim was 84 years old, and her husband (Husband) was 93 years old. The victim was five feet four inches tall and weighed 164 pounds. On August 31, 2019, at 7:27 A.M.[3], the victim's daughter dropped off the victim and Husband in the valet area of Pechanga Casino. At 7:28, the victim and Husband walked toward the restrooms that are inside the casino next to the valet entrance/exit.

At that time, defendant and Williams (collectively, defendants') were exiting the casino through the valet exit. Defendants paused at the exit doors to watch the victim and Husband walk toward the restroom. The victim had a pink purse with the strap over her left forearm. Inside the purse, the victim had $500 cash for herself and $400 cash for Husband to gamble with at the casino. Defendants followed the victim to the women's restroom.

At 7:28:37, the victim entered the restroom. Defendants followed the victim, but stopped outside the restroom, by the restroom entrance. At 7:29:07, Ms. Wise entered the same women's restroom. Wise walked past defendants, who were still at the entrance, and went to a stall.

At 7:30:35, Ms. Mitchell entered the same women's restroom. Mitchell saw Williams standing in the restroom looking at a closed stall door. Mitchell walked past Williams to an empty stall. Mitchell did not see defendant in the restroom.

---

[3] All times given in this opinion are A.M.

When Wise opened her stall door, defendants were "right outside [Wise's] stall," approximately two to three feet from the stall door. Defendant was standing, while Williams was crouched and appeared to be "sticking something in her pants." Wise said, " 'Hi.' " Williams looked up toward Wise and said, " 'Hi.' " Wise immediately exited the restroom, which was at 7:31:28. At that same time, Husband exited the men's restroom.

Mitchell, who was in a stall, heard the sound of a person briefly gagging, then whispering or low-volume speaking for approximately one second, and then a loud thud. Mitchell estimated that approximately 30 seconds after she sat down on the toilet, she heard the gagging sound. Approximately 30 to 45 seconds after that, she heard the whispering sound. Approximately 15 to 20 seconds later, she heard the thud.

At 7:32:11, defendant exited the restroom and walked toward the valet exit doors. Defendant paused by the exit and looked back toward the restroom, as though expecting Williams. Williams did not appear. At 7:32:27, defendant saw a female janitor, in uniform, walking toward the restroom. Defendant turned and walked back toward the restroom, in front of the janitor. Before the janitor could enter the restroom, defendant paused and loudly asked the janitor, "Do you work here?" The janitor, who felt physically blocked by defendant from entering the restroom, said she did work at the casino. At 7:32:42, Williams exited the restroom, and defendants immediately left the casino.

The janitor entered the restroom and found the victim on the floor. The janitor did not see a purse near the victim. At 7:32:51, the janitor left the restroom to find

4

security officers. Upon finding a security officer in the valet area of the casino, the janitor advised the officer to watch defendants, who were leaving the casino's property and told him the victim needed help.

When Mitchell exited the stall, she saw the victim on the floor not moving. Mitchell did not see a purse near the victim. Mitchell went to find security officers. At 7:33, casino security entered the restroom. A casino public safety detective, who investigates criminal activity, arrived at the restroom while paramedics were treating the victim. The detective did not see a purse near the victim. The victim's purse was not found.

The victim was taken to a hospital. She did not speak while in the ambulance. She "had extensive injuries to her scalp and her left arm." The victim suffered (1) a laceration to the back of her scalp; (2) a fracture radiating around the base of her skull (from ear to ear); and (3) a "three-and-a-half-inch long by . . . three-quarter-inch-wide" tear of the skin on her left forearm (where the skin tore away from the underlying tissue) with bruising underneath the tear. The victim suffered a significant subdural hematoma and "bleeding within the actual tissue of the brain." There were no other injuries to the backside of the victim's body.

The victim died after several days of hospitalization. The victim's "cause of death was blunt impact injuries to [her] head." Specifically, she suffered a single impact to the back of her skull, consistent with falling backward. Typically, when a person falls due to an issue such as fainting, "they collapse to the ground, they don't fall straight back." The victim's "injuries were akin to those also seen in automobile

5

accidents." The injury to the victim's forearm was caused by a "kind of scraping or movement across the forearm." The forearm injury could be consistent with a strap being forcibly pulled across the victim's forearm.

At trial, the prosecutor proceeded on the theory that Williams was the direct perpetrator of the robbery and murder, while defendant aided and abetted Williams.

## DISCUSSION

### A.     SUFFICIENCY OF THE EVIDENCE FOR FORCE

Defendant contends there is insufficient evidence that the victim's purse was taken by force or fear.

We "examine ' "the entire record in the light most favorable to the judgment" ' to determine whether it discloses substantial evidence—' "evidence that is reasonable, credible, and of solid value" '—' "from which a reasonable trier of fact could find the defendant[s] guilty beyond a reasonable doubt." ' [Citation.] Our review ' " 'presume[s] in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence.' " [Citation.] Even where, as here, the evidence of guilt is largely circumstantial, our task is not to resolve credibility issues or evidentiary conflicts, nor is it to inquire whether the evidence might " ' "be reasonably reconciled with the defendant[s'] innocence." ' " ' [Citation.] Instead, we ask whether there is ' " 'substantial evidence of the existence of each element of the offense charged' " ' such that any rational jury may have convicted defendant[s]." (*People v. Veamatahau* (2020) 9 Cal.5th 16, 35-36.)

6

Robbery requires that property be taken " 'either by force *or* by fear.' " (*People v. Montalvo* (2019) 36 Cal.App.5th 597, 611; § 211. ) "In terms of the amount of force required to elevate a taking to a robbery, 'something more is required than just that quantum of force which is necessary to accomplish the mere seizing of the property.' " (*People v. Lopez* (2017) 8 Cal.App.5th 1230, 1235.)

"[T]he defendant's physical characteristics in comparison to those of the victim may . . . be particularly relevant in determining whether the physical act applied by the defendant to the victim constituted 'force.' A shove by a defendant who is larger or stronger than h[er] victim may lead a jury to find that the shove amounted to the necessary 'force.' " (*People v. Mungia* (1991) 234 Cal.App.3d 1703, 1709; see also *People v. Mullins* (2018) 19 Cal.App.5th 594, 608-610.)

The victim was 84 years old, five feet-four inches tall, weighed 164 pounds, and was "frail." Williams was approximately six feet tall.[4] Williams was "big"; she was "heavier" and "larger" than defendant. Williams's "heavy set" build was "intimidating" to Mitchell who was five-feet-four-inches tall – the same height as the victim. In videos from the casino's security cameras, Williams appears to be younger than 50 years old.

When entering the restroom, the victim's purse strap was over her left forearm. When the victim was found, within seconds of Williams leaving the restroom, the victim no longer had her purse, and she suffered an injury to her left forearm. The

---

[4] In the People's Respondent's Brief, they take defendants' heights and weights from defendants' probation reports. We cannot use a probation report in a substantial evidence analysis because we must limit ourselves to the evidence presented to the jury. (*People v. Orloff* (2016) 2 Cal.App.5th 947, 950, fn. 2.)

injury involved the victim's skin being torn away from the underlying tissue and bruising underneath the tear. There was evidence that pulling a strap across the victim's arm could have caused the forearm injury. Further, the victim suffered a skull fracture that radiated from ear to ear across the base of her skull.

From the foregoing evidence, one can reasonably infer that Williams violently pulled the purse from the victim's forearm while shoving the victim backward causing her to strike the back of her head. The amount of force exerted resulted in injuries akin to a car crash, which is more force than was necessary to take a purse from the 84-year-old victim. Accordingly, substantial evidence supports the finding that force was used during the taking of the purse.

Defendant contends the victim could have placed her purse on the floor of the restroom stall, and Williams took the purse from there. The victim was carrying her purse on her left forearm when entering the restroom. The victim sustained an injury to her left forearm that involved her skin being torn away from the underlying tissue and bruising underneath the tear. The injury can be explained by a strap being pulled across the victim's arm. That evidence supports the finding that the victim's purse was violently taken from her forearm. Therefore, we find defendant's argument unpersuasive.

B.  SUFFICIENCY OF THE EVIDENCE FOR AIDING AND ABETTING

Defendant contends substantial evidence does not support the finding that she aided and abetted robbery, as opposed to theft. In other words, defendant does not

8

dispute that she knew a theft would take place, but she disputes aiding and abetting the use of force.

"[A]n aider and abettor is a person who, 'acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime.' " (*People v. Prettyman* (1996) 14 Cal.4th 248, 259.)

As set forth *ante*, the victim was 84 years old, five-feet-four-inches tall, weighed 164 pounds, and was "frail." Williams was approximately six feet tall and "heavyset." Williams's physical size was "intimidating" to Mitchell who was the same height as the victim. In videos from the casino's security cameras, Williams appears to be younger than 50 years old.

When defendant observed the victim walking toward the restroom, the victim had her purse strap over her forearm. That means defendant could anticipate that Williams would have to snatch the purse from the victim's body. Given the size and age differences between Williams and the victim, it would be nearly impossible for force not to be used in the taking of the purse. Therefore, the jury could reasonably conclude that defendant knew and intended for force to be used against the victim in the taking of the purse.

Defendant points to the evidence that she and Williams committed thefts in the past that did not involve force to support her argument that she did not expect force to be used against the victim. In one incident highlighted by defendant, Williams snatched

9

money from the hand of Ms. LaBauve, who worked as an exotic dancer at a gentlemen's club. From the evidence that LaBauve worked as an exotic dancer, one can infer that she was not elderly or frail. Further, LaBauve's cash was in her hand, requiring little force to take it. By comparison, the victim's purse strap was over her forearm, requiring force to remove it. Thus, the two crimes are not sufficiently similar. It was the victim's size and physical condition compared to that of Williams, plus the purse strap being over the victim's arm, that alerted defendant to the force that would be exerted against the victim when Williams violently took the purse from the victim's arm.

Defendant further asserts that there is insufficient evidence that she conspired to rob the victim. Because we conclude there is sufficient evidence to support a finding of aiding and abetting, we do not address defendant's contention concerning conspiracy.

C. SUFFICIENCY OF THE EVIDENCE FOR RECKLESS INDIFFERENCE

1. *LAW*

"Defendants who were neither actual killers nor acted with the intent to kill can be held liable for murder only if they were 'major participant[s] in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of [Penal Code] Section 190.2'—that is, the statute defining the felony-murder special circumstance." (*People v. Strong* (2022) 13 Cal.5th 698, 708.)

"Reckless indifference to human life is 'implicit in knowingly engaging in criminal activities known to carry a grave risk of death.' " (*In re Scoggins* (2020) 9

10

Cal.5th 667, 676 (*Scoggins*).) "Reckless indifference to human life has a subjective and an objective element." (*Id.* at p. 677.) We will address both elements *infra*.

### 2.  CONTENTIONS

In her first contention pertaining to reckless indifference, defendant contends she was not present when the victim was pushed backward. Contradicting that contention, defendant concedes that she was a major participant in the robbery. In a second contention, defendant asserts substantial evidence does not support the finding that she acted with reckless indifference to human life. Typically, "the greater the defendant's participation in the felony murder, the more likely that [s]he acted with reckless indifference to human life." (*Tison v. Arizona* (1987) 481 U.S. 137, 153 (*Tison*); *People v. Clark* (2016) 63 Cal.4th 522, 615 (*Clark*).) For the sake of addressing defendant's contentions, we will analyze the reckless indifference evidence apart from defendant's concession that she was a major participant in the robbery.

### 3.  TIMELINE:  DEFENDANT WAS PRESENT DURING THE VIOLENCE

We start with defendant's contention that she was not present when the victim was pushed. As set forth *ante*, under the substantial evidence standard of review, we " 'review[] the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.] 'Where . . . the jury's findings rest to some degree upon circumstantial evidence, we must decide whether the circumstances reasonably justify those findings,

11

"but our opinion that the circumstances also might reasonably be reconciled with a contrary finding" does not render the evidence insubstantial.' " (*People v. Tafoya* (2007) 42 Cal.4th 147, 170.)

In defendant's supplemental brief, she asserts, "[T]he evidence is at least as consistent with [defendant's] absence at the point when the [victim's] property was taken as it is that she was physically present." Under the substantial evidence standard, we would resolve that equality in evidence in favor of the jury's verdict. Nevertheless, for the sake of addressing defendant's contention, we will disregard her concession that there is equal evidence of presence and lack of presence.

Wise exited the restroom at 7:31:28. Wise did not see the victim. Defendant exited the restroom at 7:32:11, which was 43 seconds after Wise exited the restroom. The victim's purse was snatched from her arm, and she was pushed backward. Those actions would have taken less than 43 seconds, which means defendant had sufficient time inside the restroom to participate in the robbery.

Further support for defendant having been in the restroom during the robbery is defendant's actions when she initially exited the restroom: At 7:32:11, defendant exited the restroom walking toward the valet exit. Five seconds later, at 7:32:16, defendant looked back over her shoulder, toward the restroom, as though expecting Williams to be behind her. Defendant continued walking to the valet exit, and at 7:32:21, she paused at the exit doors and looked toward the restroom. Defendant lingered at the doors looking toward the restroom, as though expecting Williams to exit. At 7:32:27, defendant saw

the janitor walking toward the restroom and moved to block her from entering the restroom.

Defendant's actions indicate that she thought the robbery was complete when she initially exited the restroom at 7:32:11. Defendant walked to the exit, expecting Williams to be behind her so they could leave. If defendant left the restroom to serve as a lookout for a robbery that had not yet happened, then logic dictates that she would have stayed closer to the restroom to more easily intercept people like the janitor. Defendant's actions of walking toward the exit and repeatedly looking back for Williams support the conclusion that the robbery was complete before defendant initially left the restroom.

Defendant asserts Mitchell first heard the gagging sound "30 seconds after she went in the stall, the second set of sounds 30 or 45 seconds after that, and then the 'thud' 15 or 20 seconds after that, for a total of 1 minute and 15 seconds to 35 seconds." Mitchell entered the restroom at 7:30:35, if one adds 20 seconds for Mitchell to walk to a stall and sit down, that would be 7:31:25. Adding 75 seconds to that would be 7:32:40. Defendant exited the restroom at 7:32:11, so defendant asserts she was not in the restroom when the victim fell.

When the prosecutor asked Mitchell, "How soon when you sat down did you hear the—the [gagging] noise?" Mitchell answered, "I'm not exactly sure, maybe 30 seconds." When the prosecutor asked, "How long after that, if you remember, was the whisper/chatter sound?" Mitchell replied, "I'm not sure. Maybe 30 seconds, 45

13

seconds." When asked "how long after that was the—the thud sound that you recall? Mitchell responded, "Probably, maybe 15 seconds, 20 seconds. I'm not sure exactly."

Mitchell's testimony regarding the timing of events is replete with her equivocations of "I'm not exactly sure," "I'm not sure," "I'm not sure exactly," "Maybe," and "Probably." Given Mitchell's lack of certainty, a reasonable trier of fact could have disregarded her timeline and concluded that snatching the victim's purse from her arm while pushing her backward took only a few seconds.

Nevertheless, if one gives some credence to Mitchell's timeline, then there is a reasonable interpretation of the evidence, which still places defendant in the restroom during the attack on the victim. Mitchell testified that she heard whispering or low volume chatter lasting approximately one second. Wise testified that when she opened her stall door, she saw both defendants. Williams was directly outside Wise's stall, approximately two or three feet in front of Wise. Wise said, "Hi" to Williams, and Williams responded, "Hi." One could reasonably infer the exchange between Williams and Wise was the one second of low volume chatter that Mitchell heard.

Wise testified that, after saying "Hi" to Williams, she immediately exited the restroom, which was at 7:31:28. Mitchell estimated that 15 to 20 seconds after the chatter, she heard a loud thud, which would be approximately 7:31:48. One can reasonably infer that the loud thud was the sound of the victim's head striking the floor. Twenty-three seconds after the thud, at 7:32:11, defendant exited the restroom and walked toward the valet exit doors. On that timeline, defendant was in the restroom when the violence occurred.

14

In sum, substantial evidence supports a finding that defendant was in the restroom during the violence against the victim.

### 4. *ROBBERY IS AN ONGOING OFFENSE*

Another matter to address before undertaking the subjective intent analysis is that a robbery is more than the moment when a victim's property is taken. " 'The nature of the crime is such that a robber's escape with [her] loot is just as important to the execution of the crime as obtaining possession of the loot in the first place.' [Citation.] As a result, the commission of a robbery is ongoing 'until the robber has won [her] way to a place of temporary safety.' " (*People v. Debose* (2014) 59 Cal.4th 177, 205.) "For purposes of determining aider and abettor liability, the commission of a robbery continues until all acts constituting the offense have ceased," i.e., reaching a place of temporary safety. (*People v. Cooper* (1991) 53 Cal.3d 1158, 1164-1165, fn. omitted.)

### 5. *SUBJECTIVE ELEMENT*

With the understanding that defendant was in the restroom during the violence against the victim, and that the robbery was still in progress when defendant exited the restroom, we will address the subjective element of the reckless indifference analysis.

" 'As to the subjective element, "[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed," and he or she must consciously disregard "the significant risk of death his or her actions create." ' " (*People v. Emanuel* (2025) 17 Cal.5th 867, 884 (*Emanuel*).)

"To aid in distinguishing those who knowingly engage in criminal activities known to carry a grave risk of death from other felony perpetrators, [our Supreme

15

Court] 'set out a nonexhaustive list of considerations relevant to this determination, including use of or awareness of the presence of a weapon or weapons, physical presence at the scene and opportunity to restrain confederates or aid victims, the duration of the crime, knowledge of any threat the confederates might represent, and efforts taken to minimize risks.' " (*Emanuel, supra,* 17 Cal.5th at p. 884.)

### a. Knowledge of Weapons

The first factor is defendant's knowledge of weapons to be used in the robbery. (*Clark*, *supra*, 63 Cal.4th at p. 618.) There is no evidence of weapons having been used in the robbery. However, defendant observed the victim and therefore saw that Williams was significantly taller, heavier, and younger than the victim.

### b. Defendant's Presence and Opportunity to Restrain Williams's Violence or Aid the Victim

The second factor is defendant's physical presence at the robbery and the opportunities she had to restrain Williams's violence and/or aid the victim. (*Clark*, *supra*, 63 Cal.4th at p. 619; *Emanuel*, *supra*, 17 Cal.5th at p. 889.)

#### i. *Presence and Opportunity to Restrain Violence*

A defendant's physical presence at the time of the murder can provide circumstantial evidence of subjective intent when there were intermediate steps in the crime indicating that lethal force would be used, and the defendant did nothing to restrain the violence. (*Emanuel*, *supra*, 17 Cal.5th at p. 889.) Defendants followed the victim into the restroom and lay in wait for the victim—waiting for her to exit the restroom stall, but there were not intermediate steps of violence prior to the murder.

16

ii.    *Aiding the Victim*

Next, we address the issue of aiding the victim.  "[A] defendant's conduct following the use of lethal force may be reflective of his or her mental state during the offense."  (*Emanuel*, *supra*, 17 Cal.5th at p. 893.)

After the victim's head loudly hit the floor and she ceased to move, defendant left the restroom but did not seek help for the victim.  Rather, defendant actively slowed the progress of a janitor entering the restroom until Williams exited the restroom with the victim's money.  Thus, defendant was present, did not aid the victim, and actively impeded the victim from receiving aid in order to facilitate the completion of the robbery.

c.    Duration of the Robbery

The third factor is the duration of the robbery.  The longer an underlying felony lasts, the greater the chance for violence to occur.  (*Clark*, *supra*, 63 Cal.4th at p. 620.)  From the time defendant noticed the victim to the time defendant exited the casino was approximately five minutes.  During that time, defendant followed the victim, lay in wait for the victim, witnessed lethal force used on the victim, and then actively impeded a janitor from entering the restroom so as to aid in completing the robbery.

d.    Knowledge of Williams's Propensity to Kill

The fourth factor is defendant's knowledge of the likelihood of Williams using lethal force.  (*Clark*, *supra*, 63 Cal.4th at p. 621.)  "A defendant's willingness to engage in a[] . . . robbery with individuals known to h[er] to use lethal force may give rise to the

17

inference that the defendant disregarded a 'grave risk of death.' " (*Ibid.*) There is no evidence that defendant was aware of Williams having a propensity to kill.

e.      Minimizing the Risk of Violence

The fifth factor is defendant's efforts to minimize the risks of violence. (*Clark*, *supra*, 63 Cal.4th at pp. 621-622.) This factor is focused on minimizing the risk of violence prior to the felony occurring—as opposed to the factor discussed *ante* regarding physical presence during the felony, and opportunities to prevent the violence or aid the victim during and after the felony. (*Emanuel*, *supra*, 17 Cal.5th at pp. 887-888.)

The evidence of defendant not minimizing the risk of violence includes: (1) defendant, who was physically smaller than Williams, did not take the direct perpetrator role in order to minimize the risk of the victim being harmed by the larger Williams during the robbery; and (2) defendants followed the victim into a restroom, where the victim would be isolated compared to the gambling area of the casino. (See *Emanuel*, *supra*, 17 Cal.5th at p. 887 ["Emanuel planned to participate in a robbery in a public location during daylight hours. The crime occurred in the open where witnesses might be present to observe from the park, passing vehicles, or nearby residences. This factor therefore does not support a finding of reckless indifference"].) By contrast, the evidence of defendant minimizing the risk of violence is the lack of any weapon used during the robbery. (See *Id.* at p. 887 ["[T]he need to minimize the risk of violence is ' "less pressing" ' when the planned crime does not involve ' "the use of weapons" ' "].)

18

### f. Totality of the Circumstances

None of the foregoing factors is singularly controlling. "The 'totality of the circumstances' must be analyzed to determine whether the defendant acted with reckless indifference." (*Emanuel*, *supra*, 17 Cal.5th at p. 885.)

The factors most favorable to defendant are the lack of weapons involved, defendant's lack of knowledge that Williams was likely to use lethal force, and the quickness of the robbery. One could reasonably find that, prior to the robbery, defendant had little reason to know of the grave risk to the victim.

However, "[t]he taking element of robbery itself has two necessary elements, gaining possession of the victim's property and asporting or carrying away the loot." (*People v. Cooper*, *supra*, 53 Cal.3d at p. 1165; see generally *People v. Robins* (2020) 44 Cal.App.5th 413, 419 ["What sets an *Estes*[5] robbery apart from a standard robbery is that force or fear is used not in the acquisition of the property, but in the escape" fn. omitted].) "For purposes of determining liability as an aider and abettor, the commission of [a] robbery continues only so long as the loot is being carried away to a place of temporary safety." (*Cooper*, at pp. 1169-1170.)

Defendant was present for the violence against the victim, which means she heard the victim's head hit the floor and saw the 84-year-old victim on the ground not moving. At that point, defendant knew the victim was at grave risk. Defendant actively impeded aid from reaching the victim by slowing the janitor from entering the restroom

---

[5] *People v. Estes* (1983) 147 Cal.App.3d 23.

19

so she and Williams could escape with the victim's property. By furthering the robbery while the victim was on the ground and not moving defendant knowingly engaged in criminal activities that carried a grave risk of death. (*Emanuel*, *supra*, 17 Cal.5th at p. 883 [" '[R]eckless indifference to human life is "implicit in knowingly engaging in criminal activities known to carry a grave risk of death" ' "].)

Defendant contends, "The relevant time period is *before* the offense to determine whether there is a grave risk of death, not after." Reckless indifference "must exist at the time of the underlying felony." (*Emanuel*, *supra*, 17 Cal.5th at p. 894.) Defendant's act of impeding the janitor in order to facilitate Williams's escape with the victim's property, when defendant knew the victim was lying motionless, demonstrates that defendant chose to continue facilitating the robbery despite her awareness of the grave risk to the victim's life. Thus, defendant's reckless indifference occurred while the robbery was ongoing.

In *Tison*, *supra*, 481 U.S. 137, a group of people conducted a prison escape. (*Id.* at p. 139.) The group then carjacked a family and held them hostage. (*Id.* at pp. 139-140.) Upon stopping the hostages' vehicle, part of the group stayed with the hostages, while another part of the group walked to a nearby area to retrieve water. (*Id.* at pp. 140-141.) The people who went to retrieve the water (the Water Group) heard gunshots and saw one of their confederates (the Murderer) killing the hostages. (*Id.* at p. 141.)

The United States Supreme Court observed that the Water Group had provided guns to the Murderer to aid in the prison escape; the Water Group participated in the carjacking; the Water Group "stood by and watched the killing, making no effort to

20

assist the victims before, during, or after the shooting. Instead, [they] chose to assist the killers in their continuing criminal endeavors." (*Tison*, *supra*, 481 U.S. at p. 151.) The Court reasoned, "These facts not only indicate that the [Water Group's] participation in the crime was anything but minor; they also would clearly support a finding that [the Water Group] subjectively appreciated that their acts were likely to result in the taking of innocent life." (*Id.* at p. 152.)

In examining *Tison*, the California Supreme Court wrote, "In *Tison*, the high court noted this failure to render aid; after the shooting, '[n]either [of the [Water Group's members]] made an effort to help the victims.' [Citation.] Other appellate courts have considered relevant a defendant's failure to provide aid while present at the scene. The Supreme Court of Arizona, in affirming that a defendant had acted with reckless indifference to human life, noted that the defendant had 'failed to render aid knowing that one victim might not be dead.' " (*Clark, supra,* 63 Cal.4th 522, 619; see also *Scoggins, supra,* 9 Cal.5th at p. 679.)

In the instant case, upon the victim being injured, if defendants had no intent to gravely harm the victim, then they could have left the victim's purse with the victim and sought aid for the victim. Instead, with the victim on the floor, defendants continued with the robbery, demonstrating reckless indifference. As in *Tison*, defendant "chose to assist the killer[] in their continuing criminal endeavors." (*Tison*, *supra*, 481 U.S. at p. 151.) Substantial evidence supports a finding of subjective reckless indifference under the totality of the circumstances.

21

Defendant asserts that blocking the janitor's path did not demonstrate an intent to harm but a desire to avoid apprehension. In this substantial evidence analysis, we place weight on the evidence that defendant did not flee. Rather, defendant waited, and defendant returned to the restroom entrance to block the janitor. Defendant's actions demonstrate a desire to assist Williams in leaving the restroom with the victim's property, i.e., "to assist the killer[] in their continuing criminal endeavors" (*Tison, supra,* 481 U.S. at p. 151), despite the grave risk to the victim.

### 6. *OBJECTIVE ELEMENT*

"As to the objective element, ' "[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." ' " (*Scoggins*, *supra*, 9 Cal.5th at p. 677.)

When the janitor saw the victim on the floor, she immediately went to find help for the victim. When Mitchell saw the victim on the floor, she too immediately went to find help. This evidence supports the finding that a reasonable person would not disregard seeing an 84-year-old woman on the ground not moving. Defendant's acts of not seeking aid and impeding the janitor from entering the restroom are a gross deviation from the conduct of a reasonable person.

7.    *CONCLUSION*

Defendant consciously disregarded the grave risk to the victim and grossly deviated from the conduct of a reasonable person.  Thus, substantial evidence supports the finding of defendant's reckless indifference.

D.    ELDER ABUSE INSTRUCTION

1.    *INSTRUCTION*

For the elder abuse charge, the trial court instructed the jury, in relevant part, as follows:  "The defendants are charged in Count Three with elder abuse likely to produce great bodily harm or death in violation of Penal Code section 368(b)(1).

"To prove that a defendant is guilty of this crime, the People must prove that:

"1.    The defendant willfully inflicted unjustifiable physical pain or mental suffering on [the victim];

"2.    The defendant inflicted suffering on [the victim] or caused or *permitted* [the victim] to suffer, be injured, or be endangered under circumstances or conditions likely to produce great bodily harm or death."  (CALCRIM No. 830, italics added.)

2.    *ANALYSIS*

Defendant contends the trial court erred by including the word "permitted" in the instruction because it effectively removed the causation element, allowing the jury to convict defendant if she did not prevent the victim from falling.[6]

---

**6** The People contend defendants forfeited this issue by failing to object in the trial court.  " 'Failure to object to instructional error forfeits the issue on appeal unless the error affects defendant's substantial rights.' "  (*People v. Burton* (2018) 29

*[footnote continued on next page]*

The elder abuse statute also uses the word "permits": "A person who knows or reasonably should know that a person is an elder or dependent adult and who, under circumstances or conditions likely to produce great bodily harm or death, willfully causes or *permits* any elder or dependent adult to suffer, or inflicts thereon unjustifiable physical pain or mental suffering." (§ 368, subd. (b)(1), italics added.) "Under this statutory language, the class of potential defendants includes both those who directly inflict the abuse as well as those who passively fail to act." (*People v. Heitzman* (1994) 9 Cal.4th 189, 214.) "[I]n order for criminal liability to attach under section 368(a) for willfully permitting the infliction of physical pain or mental suffering on an elder, a defendant must first be under a legal duty to act." (*Id.* at p. 199.) For the sake of judicial efficiency, we will assume, without deciding, that including the words "or permitted" in the instruction was erroneous because defendant did not have a legal duty to protect the victim.

In our prejudice analysis, we examine whether the jury's other verdicts leave no reasonable doubt that the jury found defendant caused the victim's injuries and death. (*People v. Aledamat* (2019) 8 Cal.5th 1, 10.)

For the elder abuse enhancement (§ 368, subd. (b)(3)(B)), the jury was instructed, in relevant part: "The defendants are charged with the additional allegation that they proximately caused the death of a person that was 70 years of age or older.

---

Cal.App.5th 917, 923.) A defendant's substantial rights are impacted if the error is prejudicial under the standard of *People v. Watson* (1956) 46 Cal.2d 818. (*Burton*, at p. 923.) We choose to address the issue on the merits.

"To prove that a defendant is guilty of this allegation the People must prove that:

"1.    The defendant proximately caused the death of the [victim];

"AND

"2.    [The victim] was 70 years of age or older."  The jury found the enhancement true.  Thus, the jury found that defendants caused the victim's death.

For the murder special circumstance (§ 190.2, subd. (a)(17)), the jury was instructed that one element was:  "A defendant did an act that caused the death of another person."  (CALCRIM No. 730.)  The jury found the special circumstance true.  Thus, the jury found defendants performed an act that caused the victim's death.

For the robbery, the jury was instructed, in relevant part:  "The defendant used force or fear to take the property or to prevent the person from resisting."  (CALCRIM No. 1600.)  The jury was also instructed on theft by larceny, i.e., without force (CALCRIM No. 1800; § 484), as a lesser included offense of robbery.  The jury found defendants guilty of robbery.  As set forth *ante*, there is substantial evidence of force having been used against the victim.  Thus, one can conclude beyond a reasonable doubt that the jury found defendant aided and abetted the use of force.

We conclude beyond a reasonable doubt that the presumed instructional error was harmless because the jury found that defendant aided and abetted the use of force in causing the victim to fall, which means the jury did not convict defendant of elder abuse on a theory that defendant merely failed to prevent the victim from falling.

E.      PAROLE REVOCATION FINE

In Williams's appellate brief, she contended the parole revocation fine (§ 1202.45, subd. (a)), which was imposed and suspended, should be stricken. The People conceded that contention was correct and further asserted the fine should be stricken for defendant as well. Because defendant was sentenced to prison for life without the possibility of parole, her parole revocation fine should be stricken. (*People v. Coleman* (2024) 98 Cal.App.5th 709, 725.) We will strike the fine and direct the trial court to issue a new abstract of judgment.

## DISPOSITION

The parole revocation fine (§ 1202.45, subd. (a)) is stricken. The trial court is directed to issue an amended abstract of judgment striking the parole revocation fine (§ 1202.45, subd. (a)) and forward the amended abstracts to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER             
                                            J.

We concur:

RAMIREZ            
                       P. J.

McKINSTER         
                     J.